IN THE UNITED STATES DISTRICT COURT

                   WESTERN DISTRICT OF KENTUCKY


WILLIAM STEFAN WHITE,          )
Individually, and as           )
Administrator of the ESTATE    )
OF KRYSTAL BROOK WHITE;        )
A.J.W., a minor, by and        )
through his guardian,          )
WILLIAM STEFAN WHITE;          )
A.G.W., a minor, by and        )
through her guardian           )
WILLIAM STEFAN WHITE,          )
            Plaintiffs,        )
        -vs-                    ) No. 4:16-CV-138-JHM
TRANSPORTATION SERVICES,       )
INC.; GENARO SANCHEZ RAMIREZ,)
a/k/a RAMIREZ S. GENARO;        )
DAVID M. MORALES; and          )
TSI LOGISTICA FRONTERIZA,      )
            Defendants.        )


        The videotaped deposition of DAVID M.

CADES, Ph.D., called for examination pursuant to

the Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before Raelene Stamm, Certified

Shorthand Reporter licensed by the State of

Illinois, at 525 West Monroe Street, Suite 1050,

Chicago, Illinois, on the 18th day of December,

2017, at the hour of 9:00 a.m.


Reported by:  RAELENE STAMM, CSR

License No.:  084-004445

```
 1    APPEARANCES:

 2            GARMER & PRATHER, PLLC
              BY:  MR. BILL GARMER
 3            141 North Broadway
              Lexington, Kentucky  40507
 4            (859) 254-9351
              bgarmer@garmerprather.com
 5                On behalf of the Plaintiffs;

 6            REMINGER CO., LPA
              BY:  MR. B. SCOTT JONES
 7            730 West Main Street
              Suite 300
 8            Louisville, Kentucky  40202
              (502) 625-7292
 9            sjones@reminger.com
                  On behalf of the Defendants.
10
      ALSO PRESENT:
11
              MR. BEN STANSON, Videographer.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  I N D E X

 2 WITNESS                          EXAMINATION

 3 DAVID M. CADES, Ph.D.

 4     By Mr. Garmer                      4

 5

 6

 7

 8              E X H I B I T S

 9 NUMBER                          MARKED FOR ID

10 Cades Deposition

11 Exhibit No. 1  Notice of deposition        7

12 Exhibit No. 2  Curriculum vitae            12

13 Exhibit No. 3  Rule 26 testimony list      13

14 Exhibit No. 4  Series of photographs       50

15 Exhibit No. 5  Photographs of exit ramp    69

16 Exhibit No. 6  Drawing entitled The Incident  73

17 Exhibit No. 7  Astronomical chart          74

18 Exhibit No. 8  Set of astronomical data    75

19 Exhibit No. 9  Luminaries present 8/6/16   78

20 Exhibit No. 10 Drawing of Morton's Gap     79

21 Exhibit No. 11 Critical stopping distance sheet 80

22 Exhibit No. 12 Lane change calculations    92

23

24

25
```

```
 1               E X H I B I T S

 2 NUMBER                      MARKED FOR ID

 3 Cades Deposition

 4 Exhibit No. 13   Thumbdrive                    94

 5 Exhibit No. 14   Sun and moon data for 11/13/17  95

 6 Exhibit No. 15   Retroreflective properties     96

 7 Exhibit No. 16   Document of measurements       97

 8 Exhibit No. 17   Sheet linking file names       97

 9 Exhibit No. 18   Photographs D16970-001 to 058   98

10 Exhibit No. 19   Series of four photographs    102

11 Exhibit No. 20   Photograph                    115

12 Exhibit No. 21   Looming thresholds            117

13

14        (Exhibits retained by court reporter.)

15

16

17

18

19

20

21

22

23

24

25
```

1      VIDEOGRAPHER:   We are now on the record.   My

2  name is Ben Stanson representing Veritext Legal

3  Solutions.   The date today is December 18, 2017,

4  and the time is approximately 9:04 a.m.   This

5  deposition is being held at Exponent located at

6  525 West Monroe Street in Chicago, Illinois, and is

7  being taken by counsel for the plaintiffs.

8           The caption of this case is William Stefan

9  White, et al., versus Transportation Services,

10  Inc., et al., pending in the US District Court,

11  Western District of Kentucky, Case

12  Number 46:16-CV-138-JHM.   The name of the witness

13  is David Cades, Ph.D.

14           At this time the attorneys present in the

15  room and everyone attending will identify

16  themselves and the parties they represent.

17      MR. GARMER:   My name is Bill Garmer.   I'm here

18  on behalf of Stefan White and the Estate of Krystal

19  White and their two minor children.

20      MR. JONES:   Scott Jones on behalf of

21  defendants, TSI, Morales and Ramirez.

22      VIDEOGRAPHER:   Thank you.   Our court reporter

23  is Raelene Stamm representing Veritext.   Will you

24  please swear in the witness?

25

1                    (WHEREUPON, the witness was

2                    duly sworn.)

3                  DAVID M. CADES, Ph.D.,

4 called as a witness herein, having been first duly

5 sworn, was examined and testified as follows:

6                    EXAMINATION

7 BY MR. GARMER:

8     Q.    Would you tell us your full name please,

9 sir?

10     A.    Sure.  My full name is David.  Last name

11 Cades spelled C-a-d-e-s.

12     Q.    Do you have a middle initial?

13     A.    M as in Michael.

14     Q.    And how are you presently employed?

15     A.    I am a managing scientist in the human

16 factors practice at Exponent.

17     Q.    And how long have you held that position?

18     A.    I've been a managing scientist for, I

19 think, three years, and then I've worked at

20 Exponent since January of 2010.

21     Q.    Have you seen the notice to take your

22 deposition that we're doing today?

23     A.    Yes, sir, I have.

24     MR. GARMER:  I'm going to mark that as

25 Exhibit Number 1.

1                    (WHEREUPON, Cades Deposition

2                    Exhibit No. 1 was marked for

3                    identification.)

4 BY MR. GARMER:

5    Q.    Tell me what your educational background

6 is to prepare you to be in your profession.

7    A.    I have a bachelor of science in

8 engineering psychology from Tufts University, and I

9 have a master's and Ph.D. in human factors and

10 applied cognition from the Psychology Department at

11 George Mason University.

12    Q.    When did you get your Ph.D. at George

13 Mason?

14    A.    2011.

15    Q.    Before that, before getting your Ph.D.,

16 did you have any experience in the field of

17 engineering?

18    A.    Generally in the field of what I would say

19 is engineering psychology, yes.

20    Q.    Okay.  And you call yourself an

21 engineering psychologist?

22    A.    Presently I'm a human factors scientist.

23    Q.    So tell me the difference.

24    A.    Different institutions just have different

25 names.  The general field is called human factors.

1 Within human factors there are any number of

2 subspecialties and related disciplines that are

3 encompassed under there.  So at Tufts in my

4 undergrad, the human factors study was called

5 engineering psychology.  In my grad school, it was

6 human factors and applied cognition.  And,

7 collectively, it's all human factors.

8      Q.   So back to my original question is, did

9 you have experience between your undergraduate

10 degree and your Ph.D. degree in working in that

11 field?

12      A.   Yes, sir.

13      Q.   And tell me what that experience was and

14 by first tell me when you started that experience

15 after your undergraduate degree after your BS and

16 when -- how long you worked at that.

17      A.   So I started working in the field probably

18 would be around the year 2000 while I was still at

19 Tufts.  I worked at Verizon Laboratories doing

20 user-centered research and usability.  And then

21 throughout both my undergraduate tenure and grad

22 school, I had various other jobs in the human

23 factors field.  I worked a company called

24 Electronic, Inc., doing user-centered design.

25           Between undergraduate and grad school, I

1 worked for two years at a company called Lighthouse

2 International doing vision related research.  I did

3 some contract work for a company that was called

4 User Centric doing usability and user-centered

5 design, and then I had a couple other small

6 contract type work that I did.  I don't recall the

7 specifics.

8     Q.   And when did you -- when did you finish

9 your -- I think you said that you finished your

10 Ph.D. in 2011?

11     A.   Yes, sir.

12     Q.   And in 2011, were you already working for

13 Exponent?

14     A.   Yes, sir.

15     Q.   When did you start working for Exponent?

16     A.   January 2010.

17     Q.   And where did you start working for

18 Exponent?

19     A.   Here in the Chicago area.

20     Q.   Where we are right now?

21     A.   No, sir.  We had an office out in

22 Wood Dale, Illinois.

23     Q.   Do you still have that office?

24     A.   No, sir.

25     Q.   Is this building where we are right now,

1 is this Exponent's main office?

2     A.     Exponent is headquartered in Menlo Park,

3 California.

4     Q.     What size company is Exponent?

5     A.     We have about a thousand employees.

6     Q.     Do you have a website?

7     A.     Yes, sir.

8     Q.     And how would you describe what Exponent's

9 business is?

10     A.     We are a scientific and engineering

11 consulting firm, and we help our clients address

12 any scientific and engineering questions they might

13 have.

14     Q.     And tell me what the gamut of that is.

15     A.     We have over 90 scientific and engineering

16 disciplines ranging anything from health sciences,

17 food science, materials, corrosion, electrical

18 engineering, civil engineering, mechanical

19 engineering, human factors, and however many more I

20 need to do to get to 90.

21     Q.     And I take it all of this is set forth on

22 a website for the company?

23     A.     The scope of the work and areas that we

24 work in is covered on the website.

25     Q.     Is there a specific area where you are

1 identified on the website?

2     A.    Yes, sir.

3     Q.    Where are you identified?

4     A.    I have a page with my name on it.

5     Q.    Okay.  And what -- how's that identify

6 you?

7     A.    As a managing scientist in the human

8 factors practice.

9     Q.    And what does that mean, to be a managing

10 scientist in the human factors practice?

11     A.    So the managing scientist part is my job

12 title, and then the human factors practice is the

13 area in which I work or the practice under which I

14 work.

15     Q.    Okay.  In what we've marked as

16 Exhibit Number 1, I've asked that you bring certain

17 items with you to the deposition today, and I ask

18 if you have brought those items.

19     A.    Yes, sir.

20     Q.    And the first item that we asked for was

21 an up to date CV including a list of all

22 publications authored by you in the preceding

23 10 years.  Do you have that with you?

24     A.    Yes, I do.

25     Q.    And can we have a copy of that?  And the

1 reason I ask you for copies of it is because I want

2 to make sure we've got the up to date one.

3         Thank you.  And can we mark this then as

4 Exhibit Number 2 to the deposition with your

5 permission?

6     A.   Fine with me.

7                  (WHEREUPON, Cades Deposition

8                  Exhibit No. 2 was marked for

9                  identification.)

10 BY MR. GARMER:

11    Q.   And this sets forth -- this CV sets forth

12 your academic credentials and your publications and

13 your presentations; is that fair?

14    A.   That's some of the information contained

15 on there, yes.

16    Q.   Okay.  Do you have -- I've also asked if

17 you have brought a list of the -- then I ask you if

18 you brought a list of the cases that you have been

19 involved in as an expert witness since you have

20 finished your education from your BS on.

21    A.   I have my Rule 26 testimony list, if

22 that's what you're referring to.

23    Q.   Yes.

24    A.   Okay.  Would you like it?

25    Q.   Yes, sir.  Thank you.

Page 13

1      MR. GARMER:  Let's mark that as

2 Exhibit Number 3 to the deposition.

3                        (WHEREUPON, Cades Deposition

4                         Exhibit No. 3 was marked for

5                         identification.)

6 BY MR. GARMER:

7      Q.    And let's go to your depositions.  Have

8 you ever, in deposition or trial, ever testified as

9 a witness who provided evidence to support the

10 plaintiff in the case?

11     A.    Yes, sir.

12     Q.    Can you mark on Exhibit Number 3 which

13 ones where you have provided evidence on behalf of

14 the plaintiff in the case?

15     A.    I'm going to write a P next to the ones --

16     Q.    That would be great?

17     A.    -- that were plaintiff.

18     Q.    Thank you, sir.

19     A.    You're welcome.

20     Q.    Looks like out of all the cases that

21 you've given us here, you've testified for the

22 plaintiff in three cases?  And you have one as a

23 trial, so I don't know if that's an overlap.

24     A.    It is not.

25     Q.    So you have four cases, three depositions

1 and one trial?

2      A.    That is correct.

3      Q.    Okay.  Can you tell me in the case that is

4 Neubauer versus Acuity, can you tell me what that

5 case was about?

6      A.    That was a motorcycle/motor vehicle

7 accident at an intersection in a construction zone

8 with questions related to driver behavior and sight

9 lines.

10     Q.    And then in the case of Tawanna Hatfield

11 versus Nisource, Inc., what was that case about?

12     A.    That was a motor vehicle accident at

13 night, a single car, with questions related to

14 visibility and conspicuity of a roadway hazard.

15     Q.    And in the case of Schmidt versus

16 Wisconsin Bell, can you tell us what that case was

17 about?

18     A.    That was a motor vehicle accident at an

19 intersection involving driver behavior and sight

20 lines.

21     Q.    And then finally the case of Karl B.

22 Browning versus The Board of Commissioners of the

23 County of Monroe, what was that case about?

24     A.    That had to do with a temporary

25 restraining order filed to prohibit a construction

1 project from moving forward, and I was looking at

2 the effectiveness and how backup alarms and other

3 audible warning signals were being used at the

4 construction site.

5      Q.    Did you file a report in that case?

6      A.    I do not believe I did, no.

7      Q.    In the Schmidt case, did you file a

8 report?

9      A.    I believe I have a disclosure at least in

10 that case.  I'm not sure if it was a full Rule 26

11 style report.

12     Q.    But an expert disclosure, you believe?

13     A.    I do believe, yes.

14     Q.    Okay.  I'd like to ask for a copy of your

15 report in that case, if you could provide that to

16 me?

17     MR. JONES:  You said this was -- this report

18 was disclosed?

19     THE WITNESS:  To the best of my knowledge, it

20 was.  I can't recall specifically if it was marked

21 at my deposition.

22     MR. JONES:  Okay.  Well, we'll review the

23 request, and we'd ask that any request that you

24 have place in writing to us after this deposition.

25     MR. GARMER:  Okay.

1 BY MR. GARMER:

2     Q.    Did you did you do a report in Tawanna

3 Hatfield case?

4     A.    I believe I did, yes.

5     Q.    Okay.  And I'd like to ask for a copy of

6 that report.

7     MR. JONES:  Okay.  Again, all requests, please

8 place them in writing, and we'll review it after

9 the deposition.

10 BY MR. GARMER:

11    Q.    Did you do a report in the Neubauer case?

12    A.    That one I don't specifically recall.  I

13 may have had a disclosure as well, but something I

14 could find out.

15    Q.    Yes.  We'd like to -- if you've done a

16 report, we'd like to request it.  So if you would

17 check and see if you've done a report in that case

18 and tell us one way or the other that you have or

19 you have not done a report, that would be

20 appreciated.

21         Have you ever testified in a case or

22 testified or provided expert opinion in a case

23 involving an 18-wheeler.

24    A.    Yes, sir.

25    Q.    And can you mark for us on

1 Exhibit Number 3 which cases?  And I guess you

2 could just put 18W next to it.

3     A.   There's one case, the Van Dorn V McNish

4 case, had a large dump truck.  I wouldn't

5 necessarily call it an articulating

6 tractor-trailer.  So that's kind of a halfway

7 there.

8     Q.   Why don't you write down next to it, large

9 dump truck.  That'd be great.

10         Thank you, sir.

11    A.   No problem.

12    Q.   Now, on Exhibit Number 3, you had the

13 Estate of Brandon Williams where you say that case

14 involved an 18-wheeler.  Can you tell us what that

15 case was about?

16    A.   That was an accident that occurred on an

17 interstate at night involving a disabled vehicle

18 and an 18-wheeler.

19    Q.   And did you do a report in that case?

20    A.   Yes, sir.

21    MR. GARMER:  I'd like to request a copy of the

22 report.

23    MR. JONES:  Okay.  We'll consider all requests,

24 just place them in writing.

25

1 BY MR. GARMER:

2    Q.    Then in the Van Dorn case which you said

3 involved an articulated dump truck, a large,

4 articulated dump tuck, did you do a report in that

5 case?

6    A.    Correction.  I'm not sure if it was

7 articulating or not.

8    Q.    Okay.

9    A.    I just said it was a large dump truck,

10 that I was not sure if it was articulated.

11    Q.    Fair enough.  Fair enough.  As you know,

12 whenever I ask you a question, if you have -- if

13 you want to further identify it, please feel free

14 to do that.  Don't feel limited by the question

15 itself.

16    A.    No, sir.  I appreciate that.  Thank you.

17    Q.    Now, did you do a report in that case?

18    A.    I do not recall.

19    Q.    If you did, would you check and provide us

20 with a copy of that report?

21    MR. JONES:  Again, we'll consider all requests,

22 just place them in writing.

23 BY MR. GARMER:

24    Q.    In the case of Ramey versus The City of

25 Commerce, did you do a report in that case?

Page 19

1     A.     I believe I had a disclosure, an expert

2 disclosure in that case.

3     Q.     Okay.  And we'd like to request a copy of

4 that expert disclosure in that case.

5            And what did that case involve?

6     A.     That case involved a tanker truck,

7 18-wheeler, that lost control with allegations of a

8 vehicle on the side of the road that had pulled

9 into traffic being a facilitation of that incident.

10    Q.     Okay.  And then in the trial -- the two

11 trials that you had, The Estate of Brandon

12 Williams, what did that case involve?

13    A.     So both of the trials are the same as the

14 two depositions that we just discussed.  So the

15 Williams was the disabled vehicle on the interstate

16 at night, and then Ramey was the -- City of

17 Commerce was the 18-wheeler that lost control.

18    Q.     Have you ever testified in case where an

19 18-wheeler had stopped on the travel portion of an

20 interstate highway and begun to back up?

21    A.     No, sir, I have not.

22    Q.     This is the only case in which you've

23 involved with that fact situation?

24    A.     To the extent that those facts are in

25 evidence, that would be correct.

1    Q.    Okay.  You don't dispute the fact that

2 Mr. Ramirez in this case had just immediately

3 previous to the collision had stopped his

4 18-wheeler on the travel portion of Kentucky or

5 Interstate 69?  You don't dispute that, do you?

6    MR. JONES:  Objection to form.

7        You may answer.

8    THE WITNESS:  That's consistent with my

9 understanding of the facts of the case.

10 BY MR. GARMER:

11    Q.    And you read Sergeant Craft's report of

12 the collision, and Sergeant Craft in his report,

13 you agree, indicated that Mr. Ramirez was

14 attempting to back his truck up on the interstate

15 highway to reach the exit called Morton's Gap?

16    MR. JONES:  Objection as to form.

17 BY MR. GARMER:

18    Q.    Immediately before the collision, that's

19 what he was doing?

20    MR. JONES:  Objection to form.

21        You may answer.

22    THE WITNESS:  My understanding of the report,

23 and I'm happy to refer to it, is that he,

24 Sergeant Craft, he based his knowledge of the

25 backing maneuver on the witness testimony.  I think

1 it was Miss Oelschlager and Miss Whaley who

2 testified that the truck was backing at some point

3 as they were approaching it, and Sergeant Craft

4 incorporated that into his report.

5 BY MR. GARMER:

6    Q.   Do you know what -- do you know at what

7 point the truck was actually -- that Mr. Ramirez

8 was actually backing the 18-wheeler down the

9 interstate?

10    MR. JONES:  Objection to form.

11        You may answer.

12    THE WITNESS:  Again based on the testimony of

13 the witnesses, it would appear that the backing

14 maneuver would have occurred as Miss Oelschlager

15 and Miss Whaley were approaching -- approaching

16 Mr. Ramirez's vehicle and would have concluded as

17 they, Miss Whaley and Miss Oelschlager, were

18 passing based on their testimony.

19 BY MR. GARMER:

20    Q.   And have you calculated that had the

21 backing procedure stopped at the time of the

22 collision with Krystal White's vehicle?

23    A.   I'm sorry.  Could you rephrase that?

24    Q.   Had the backing procedure stopped at the

25 time of the collision with Krystal White's vehicle?

1    A.   Again based on my review, the witness

2 testimony as well as the expert analysis performed

3 by Mr. Miller and Dr. Noll, the backing maneuver

4 had stopped prior to the collision.

5    Q.   How long prior to the collision had

6 Mr. Ramirez stopped the backing procedure?  How

7 many seconds prior to the collision?

8    A.   I have not seen that number specifically

9 quantified beyond the, you know, 9 to 10 seconds

10 that was based on Miss Oelschlager's recount of

11 when she passed versus, you know, when she saw the

12 incident, so somewhere in that time frame.

13    Q.   Is it my understanding that you're

14 interpreting that before the collision, that

15 Mrs. Oelschlager passed Mr. Ramirez's 18-wheeler 9

16 to 10 seconds before the collision?

17    A.   I can go back and check.  That's my

18 recollection of her testimony, but I'll take a

19 quick look here.  It was either her or Miss Whaley

20 who said that.

21    MR. GARMER:  Let's go off the record and give

22 him an opportunity to look.

23    VIDEOGRAPHER:  We're off the record at

24 9:31 a.m.

25

Page 23

1                    (WHEREUPON, a short recess was

2                     taken.)

3     VIDEOGRAPHER:  We are back on record at

4 9:34 a.m.

5     MR. GARMER:  And why don't we read the question

6 back that we had on the witness?

7                    (WHEREUPON, the record was read

8                     as requested.)

9     THE WITNESS:  So I couldn't find the specific

10 numbers that I was looking for, but I remembered in

11 Dr. Noll's report on Page 7, he states the

12 separation distance between Oelschlager's Toyota

13 and White's Sebring was determined based on

14 Miss Oelschlager's description of the location, the

15 highway, where she observed debris in the rear-view

16 mirror, the separation distance was likely more

17 than a thousand feet.  So based on highway speeds

18 and that number gives us about that time estimate.

19 BY MR. GARMER:

20     Q.   As I understand your testimony, you made

21 no measurement of what that distance was?

22     A.   No, sir, I did not.

23     Q.   And you're relying totally on Dr. Noll's

24 interpretation of how he measured that distance?

25     A.   That matches with my understanding of the

1 testimony.

2     Q.    Right.  But you made -- you have no

3 calculations of that, of those measurements?

4     A.    I have no calculations of the specific

5 separation distance of the Oelschlager vehicle to

6 the White vehicle.

7     Q.    So as we sit here today, you don't know

8 what the separation was at the time of the

9 collision between Miss Oelschlager's vehicle and

10 Miss White's vehicle; is that correct?

11    A.    Other than I know that it was a short

12 enough distance such that Miss Oelschlager could

13 see the headlights and the impact in her rear-view

14 mirror based on her testimony.

15    Q.    By that you mean see the headlights of

16 Krystal's vehicle?

17    A.    That's again consistent with my

18 interpretation of the testimony.  Miss Oelschlager

19 doesn't specifically identify those headlights as

20 Miss White's.

21    Q.    And as I understand it then, you can't say

22 what the exact interval of time was between

23 Miss Oelschlager being abreast of the rear of the

24 18-wheeler and the time of impact with Miss White's

25 vehicle?

1    A.    Not specifically, no.

2    Q.    Do you intend to try to calculate any

3 further between now and the time of the trial what

4 that distance was?

5    A.    No, sir.

6    Q.    As a human factors engineer, can you tell

7 me is it ever safe within the field of engineering

8 for a truck driver to back an 18-wheeler down an

9 active interstate highway?

10    MR. JONES:  Objection to form.

11        You may answer.

12    THE WITNESS:  So, first of all, just to be

13 clear, I'm not an engineer.  I'm a human factors

14 scientist.  That's an important distinction.

15    MR. GARMER:  Okay.

16    THE WITNESS:  As far as your question is it

17 ever safe, there certainly could be some scenario

18 by which that would -- could be a reasonable course

19 of action.

20 BY MR. GARMER:

21    Q.    Did Mr. Ramirez's actions on the night of

22 August the 6th of 2016 fall within what you just

23 described?

24    A.    No, sir.

25    Q.    Were Mr. Ramirez's actions in backing the

1 18-wheeler down I-69 on the night of August the 6th

2 of 2016 such that they put the lives and safety of

3 other people in jeopardy?

4    MR. JONES:  Objection to form.

5         You may answer.

6    THE WITNESS:  Based on my analysis, the

7 presence and the actions of the truck and

8 Mr. Ramirez's actions created a roadway hazard.

9 They created a roadway hazard such that an alert

10 and attentive driver could avoid it.  So was it a

11 hazard?  Yes.  Could it have been avoided?  Yes.

12    Q.   Okay.  My questions now are centering on

13 Mr. Ramirez's actions, and what you are now saying

14 to me is Mr. Ramirez's actions, in your field of

15 study as a human factors specialist, created a

16 roadway hazard, fair?

17    A.   I agree with that characterization.

18    Q.   And that roadway hazard and what

19 Mr. Ramirez did put the lives and safety of other

20 people using an interstate highway on that night at

21 that location in danger?

22    MR. JONES:  Objection.

23         You may answer.

24    THE WITNESS:  I don't agree with that

25 characterization.

1 BY MR. GARMER:

2    Q.   You don't believe that Mr. Ramirez's

3 action placed anyone using I-69 that night in

4 danger?

5    MR. JONES:  Objection, asked and answered.

6        You may answer the same question again.

7    THE WITNESS:  Again based on my analysis and my

8 expertise in the field of human factors, the

9 presence of the truck and the actions of

10 Mr. Ramirez created a roadway hazard that was

11 avoidable.  That's the best answer I can give you.

12 BY MR. GARMER:

13   Q.   What do you mean a roadway hazard?

14   A.   So a roadway hazard would be something in

15 the road or on the road, however you want to

16 characterize it, that requires attention and that

17 requires, in this case, if you determine that

18 hazard's in your path of travel requires some

19 action.

20   Q.   You've already told us that you cannot

21 tell us what the time was between the time that

22 Miss Oelschlager was just abreast of the rear of

23 Mr. Ramirez's truck and the time that the collision

24 occurred; is that correct?

25   A.   Not beyond the estimates that have been

1 presented, no.

2     Q.    You saw Miss Oelschlager's testimony,

3 correct?

4     A.    I reviewed her testimony, yes.

5     Q.    And did you see that she testified that

6 Mr. Ramirez's truck at the time Miss Oelschlager

7 went past the truck was blocking both the

8 right-hand lane of I-69 and a substantial portion

9 of the left-hand lane?

10     MR. JONES:  Objection.

11         You may answer.

12     THE WITNESS:  I don't recall the

13 characterization of this left-hand lane as a

14 substantial portion.  I do agree that she testified

15 that as she passed, as Miss Oelschlager passed the

16 Ramirez vehicle, that a portion of it was in

17 covering the right lane and in the left lane.

18 BY MR. GARMER:

19     Q.    And in the left lane?

20     A.    Yes, sir.

21     Q.    Did you read Miss Oelschlager's testimony

22 that she said to avoid the truck, she had to go

23 into the median of the left-hand lane and off the

24 shoulder to avoid it?

25     MR. JONES:  Objection.

1        You may answer.

2     THE WITNESS:  Again, I don't think that -- that

3 does not specifically match with my recollection of

4 her testimony.  She testified that she had to leave

5 the left lane of travel and get onto the shoulder

6 and did mention specifically the rumble strips.   I

7 don't recall specifically her mentioning that she

8 left the shoulder.

9 BY MR. GARMER:

10     Q.   Do you characterize that motion by

11 Mrs. Oelschlager's vehicle to be a normal driving

12 procedure?

13     A.   In response to the hazard that she was

14 presented, yes.

15     Q.   Do you identify that as being an emergency

16 driving procedure?

17     MR. JONES:  Objection to form.

18        You may answer.

19 BY MR. GARMER:

20     Q.   You've already said she went into the left

21 hand.  She went over into the median strip.  Do you

22 identify that as being a normal driving procedure?

23     A.   As I think I've already stated in response

24 to the situation, in response to her environment,

25 yes.

1    Q.   Was it an emergency situation?

2    MR. JONES:  Again objection to form.

3    THE WITNESS:  As far as the semantics of the

4 word emergency go, you know, again she testifies

5 that she was able to -- she said I could, and I'm

6 very smoothly into the left lane.  So if you want

7 to parse, you know, her words to that level, I

8 mean, she had to make an avoidance response.  She

9 was able to.  There was not an incident with her.

10 But as far as whether it's an emergency, I don't

11 have a way of answering that.

12 BY MR. GARMER:

13    Q.   As a human factors specialist, you know

14 what the definition of an emergency situation is in

15 on a highway, don't you?

16    MR. JONES:  Objection.

17    THE WITNESS:  I've seen definitions of that

18 word, but again it's something that one person can

19 call something an emergency.  Someone else

20 couldn't.  It's just semantics to me.

21 BY MR. GARMER:

22    Q.   But I'm -- right.  Well, I'm not

23 interested in semantics.  What I'm interested in is

24 your opinion as a human factors specialist as to

25 what constitutes an emergency situation on a

1 highway and whether or not what Miss Oelschlager

2 had to do with her vehicle was in response to an

3 emergency situation.

4     MR. JONES:  Asked and answered.

5          And you can answer it again.

6     THE WITNESS:  Again I don't know how to better

7 answer the question.  There was a roadway hazard

8 presented.  She took actions to avoid it.  You

9 know, whether, you know, she wants to describe that

10 as an emergency or someone else -- you know, from

11 my perspective, she was acting as a reasonably

12 alert and attentive driver to the presentation of a

13 roadway hazard, and that's the best I can do.

14 BY MR. GARMER:

15     Q.   But what I'm getting at is that she

16 described, Miss Oelschlager described that she had

17 to get over into the median on the left-hand side

18 of the road to avoid Mr. Ramirez's truck.  And I

19 want to know, as a human factors expert, do you

20 believe that what she described constituted an

21 avoidance of an emergency situation.

22     MR. JONES:  Objection to the characterization

23 of the testimony.

24          You may answer.

25     THE WITNESS:  And again, you know, she got out

1 of the left lane of travel as she testified to.

2 She made an avoidance response to a hazard, and

3 that's how I'm going to describe it.

4 BY MR. GARMER:

5    Q.   And you are not going to tell us whether

6 you will describe that maneuver on

7 Miss Oelschlager's part as a response to an

8 emergency situation?

9    MR. JONES:  Objection, asked and answered.

10        You can answer again.

11    THE WITNESS:  In my analysis, in my field and

12 the way I apply it, I do not use that word

13 emergency.

14 BY MR. GARMER:

15    Q.   What word do you use?

16    A.   I think I've answered that already.  There

17 was a roadway hazard presented, and she made an

18 avoidance response to that roadway hazard.

19    Q.   And you don't know and will not be able to

20 tell us now or tell the jury what period of time

21 passed from the time Miss Oelschlager made that

22 response right at the corner of the 18-wheeler and

23 the time that the collision with Krystal actually

24 occurred?

25    MR. JONES:  Objection.  You've already -- he's

1 already -- you've already asked this question.

2 It's already been answered once.

3          You can answer it again.

4      THE WITNESS:  Beyond the estimates that have

5 been provided in either of the testimony or the

6 analysis of the other experts, I am not going to be

7 making any specific claims as to what that time

8 period was.

9 BY MR. GARMER:

10     Q.    Have you calculated how many violations of

11 the Kentucky Revised Statute and any of National

12 Transportation Statutes Mr. Ramirez violated in

13 backing his vehicle down the interstate highway?

14     A.    No, sir.

15     Q.    You've made no attempt to know if there

16 were any violations of statute by Mr. Ramirez?

17     A.    Those are two different questions.

18     Q.    Okay.

19     A.    So which question would you like me to

20 answer?

21     Q.    Answer my second one then.

22     A.    Okay.  So based on my review of evidence

23 provided, I have seen reference to certain statutes

24 that it's been suggested that he violated, but I

25 have no opinion one way or the other as to, you

1 know, as to the statutes and whether they were

2 violated or not.

3    Q.   So all you've done, as I understand what

4 you're telling me is, all you have done is look at

5 the opinions of other experts who have been

6 provided mostly by the plaintiff and that they have

7 referred to the violation of statutes, but you've

8 made no analysis about whether Ramirez violated any

9 statute whatsoever.  Is that a fair statement?

10    A.   Mostly.  I would just say that I've

11 evaluated the totality of the information that's

12 been provided to me.  And to the extent that others

13 have commented on violations or potential

14 violations, I've certainly read that, but I have

15 not made any independent analysis or come to any

16 independent conclusions myself as to those

17 statutes.

18    Q.   Do you agree or disagree with the

19 statements by the other experts that there were

20 statutory violations by Mr. Ramirez in backing his

21 vehicle down the interstate highway?

22    MR. JONES:  Objection, broad and vague.

23        You can answer.

24    THE WITNESS:  I think that's outside the scope

25 of my expertise, and I, you know, I don't have a

1 basis to agree or disagree other than to have read

2 it.

3 BY MR. GARMER:

4     Q.    Tell me why it is that the violation of

5 statute by a truck driver is outside of your scope

6 of expertise.

7     A.    So for the purposes of this case, what

8 I've been asked to do is to look at the visibility,

9 the conspicuity, the human factors surrounding the

10 hazard presented by the Ramirez vehicle in the

11 position that it was in, and the ability of

12 approaching drivers to perceive and react to that

13 hazard.

14    Q.    Did you in doing that try to make an

15 analysis of the degree of the hazard presented by

16 Mr. Ramirez's action to other drivers as they use

17 the roadway?

18    MR. JONES:  Objection to form.

19         You may answer.

20    THE WITNESS:  So I would not characterize --

21 I'm not comfortable with the idea of a degree of

22 hazard.  What I did was look at based on the facts

23 in evidence, the information I reviewed, what this

24 hazard, what form this hazard took, how that would

25 have appeared to drivers approaching, and then

1 those -- the ability of drivers in that position to

2 react to that hazard.

3 BY MR. GARMER:

4     Q.    Physicians will often describe a

5 situation, a condition, as mild, moderate or

6 severe.  Would you describe the hazard that was

7 presented to drivers using the roadway on I-69 by

8 Mr. Ramirez's action on the night of August the

9 16th as being a mild, moderate or severe hazard?

10    A.    That is not a characterization type that I

11 would use.

12    Q.    What would you use?

13    A.    So I would look at the avoidability of the

14 hazard as it's presented to an alert and attentive

15 driver, in this case alert and attentive driver,

16 approaching.  And the determination I've made is

17 that it was an avoidable hazard.

18    Q.    If the truck, Ramirez's truck, at the time

19 of the collision was merely on the side, on the

20 right-hand side of the interstate highway, not

21 crossing either one of the lanes of the highway,

22 would you agree that that would be a mild hazard,

23 if any?

24    MR. JONES:  Objection.

25         You may answer.

 1    THE WITNESS:  Again, I don't -- I do not

 2 characterize again the degree of hazard in the way

 3 that you're describing.  The hypothetical that

 4 you've posed would be a different situation with a

 5 different set of available cues that I could then

 6 go and analyze and assess the ability of a driver

 7 approaching, a reasonably alert and attentive

 8 driver approaching that hazard that you've

 9 suggested and see whether I would expect an alert

10 and attentive driver in that position to be able to

11 avoid that hazard.

12 BY MR. GARMER:

13    Q.   Would you describe the hazard presented by

14 the 18-wheeler that Mr. Ramirez was driving at the

15 time of the collision with Krystal as creating a

16 severe hazard to traveling motorists?

17    MR. JONES:  Objection.

18         You may answer again.  Form.

19    THE WITNESS:  Again, you know, I think I've

20 been pretty clear that the qualifying words that

21 you are using are not ones that I would use in

22 describing the hazard.

23 BY MR. GARMER:

24    Q.   How would you describe the hazard?  If

25 you've said you described it as -- you've

1 determined that it's avoidable, but how would you

2 describe the hazard and what kind of danger it

3 presented to traveling motorists?

4    A.   So which of those two questions would you

5 like me to answer?

6    Q.   Well, I thought there was only one, but

7 you take them as you want.

8    MR. JONES:  Objection to form.

9         Go ahead if you can answer.

10   THE WITNESS:  So the first question as to how I

11 would describe the hazard would be that there was a

12 conspicuous, large, lit, detectible hazard, roadway

13 object in a lane of travel either stopped or slow

14 moving.  So that's how I would describe the hazard.

15 And, I'm sorry, I forget the second part now.

16 BY MR. GARMER:

17   Q.   You traveled to Kentucky to Morton's Gap?

18   A.   Yes, sir, I did.

19   Q.   When did you do that?

20   A.   It would appear I was there on August 22

21 of 2017.

22   Q.   Who was with you?

23   A.   One of my colleagues, Dr. Ben Lester

24 accompanied me.  And then when we were there, we

25 met a driver who was employed by TSI, and I don't

1 know the driver's name.

2    Q.   And was that driver driving an 18-wheeler?

3    A.   Yes, sir, an exemplar that was chosen to

4 be similar to the tractor and trailer that were

5 involved in this incident.

6    Q.   And do you have pictures of that exemplar

7 in your report?

8    A.   I have one picture in my report, and then

9 in my file I have the rest of the pictures.

10    Q.   May I take an opportunity to look at the

11 rest of the pictures you have in your file?

12    A.   Do you want me to just pass this whole

13 thing or take it out for you?

14    Q.   That would be great.  I mean, that would

15 be easier, I think.

16    MR. JONES:  Bill, why don't you take a minute

17 to look at those pictures.  And if this is a good

18 breaking time, let's take a break.

19    VIDEOGRAPHER:  We're off the record at --

20    MR. JONES:  No, no, no.  We're not off the

21 record unless Bill agrees.

22    MR. GARMER:  I agree.

23    VIDEOGRAPHER:  We are off the record at

24 9:58 a.m.

25

Page 40

1                    (WHEREUPON, a short recess was

2                    taken.)

3      VIDEOGRAPHER:  We are back on the record at

4 10:05 a.m.

5 BY MR. GARMER:

6      Q.   Before we took a break, we were talking

7 about your report, and you had very kindly handed

8 me copies of your report.  And as I see it in your

9 report, you have a whole series of photographs

10 which I don't believe have been marked into

11 evidence at any other portion of the case that are

12 marked beginning with DI6799 through 001, and I

13 would ask you -- and then through 0360.  I would

14 ask you if you could tell us generally what those

15 photographs show us.

16      A.   Sure.  You can take them out or just hand

17 them to me.

18      Q.   Well, I'll just hand them to you like

19 that.  And that way we'll be able to handle them

20 better, I think.

21      A.   Okay.  So there are a series of

22 photographs from my inspection of the incident

23 scene on August 22, 2017.  We have some photographs

24 of an exemplar Sebring --

25      Q.   Yes.

1    A.    -- which --

2    Q.    Go ahead.

3    A.    Which was -- I'd have to double-check it.

4 I believe it was the same exact year as

5 Miss White's.  It was definitely within the same

6 build year, what they call -- if it's not the exact

7 same, it would be a sister clone, so -- but the

8 structure of the vehicle would be similar.

9    Q.    What color is the vehicle in your

10 photographs?

11    A.    It's a red Sebring.

12    Q.    What color was Krystal's vehicle?

13    A.    It was silver.

14    Q.    Do you know why you chose a red vehicle as

15 the exemplar vehicle when Krystal's vehicle was a

16 silver vehicle?

17    A.    The color of the vehicle for the purposes

18 of why I needed a similar vehicle, the color of it

19 was not relevant to my analysis.

20    Q.    In your analysis did you try to determine

21 the conspicuity or the visual of the vehicle

22 Krystal was driving by other drivers?

23    A.    That was not specifically part of my

24 analysis.  However, the -- you know, research has

25 shown that the at night under low, relatively low

1 illumination conditions, the body color of a

2 vehicle, the passenger car, is not a strong factor

3 in determining conspicuity.

4     Q.    Is it a factor in determining conspicuity?

5     A.    There were some differences observed, and

6 this is a experiment, looking at detection

7 distances of the side of an unlit vehicle in a low

8 illumination scenario.  There were some differences

9 between the body color, but they did not reach

10 statistical significance.  So from a scientific

11 perspective they were the same.

12     Q.    Did you take that into account at all in

13 choosing to use a red vehicle to depict Krystal's

14 vehicle?

15     A.    You know, again the purpose of the

16 exemplar vehicle was to gain an appreciation in the

17 vehicle type that Miss White was driving that

18 night.  What the -- what the scene would look like

19 and what the situation would look like with similar

20 headlights, you know, similar windshield, similar,

21 you know, hood length and so matching on there.

22         With respect to the body color of the

23 vehicle, again there's no -- number one, it has

24 nothing to do with assessing the conspicuity of the

25 hazard in this case.  And, number two, the

1 testimony of the drivers, the -- or the -- and

2 passengers of Wadlingtons and the Pattons who were

3 behind Miss White, testified they had certainly no

4 trouble seeing her vehicle.  Similarly,

5 Miss Oelschlager was able to see her headlights.

6 The lighting of a vehicle under low illumination is

7 a much stronger determinant of the conspicuity of

8 that vehicle.

9     Q.    There was nothing to prevent you from

10 getting an exemplar vehicle which was identical in

11 color to Miss White's, was it?

12    A.    Beyond the difficulty of finding the

13 exemplar, no.

14    Q.    Who found the exemplar for you?

15    A.    It was found through some associates at

16 Exponent.

17    Q.    And who were they?

18    A.    So there were two people.  They're not

19 listed by name there.  One is a woman named Dana

20 Collins.

21    Q.    Who is she?

22    A.    She's a technical assistant at Exponent.

23    Q.    What does she do?

24    A.    She assists in sometimes reviewing

25 materials for cases as well as helping, in this

1 case, find and locate exemplar vehicles and

2 coordinate when we need to do road closures and

3 things like that. So she just helps with kind of

4 like the logistics of some of our fieldwork.

5    Q.   Did she act under your instructions?

6    A.   Yes, sir. Anyone we talk about at

7 Exponent in this case other than me who worked on

8 this file was working at my direction.

9    Q.   Did you instruct Miss Collins to find a

10 vehicle of the same color of Krystal's vehicle?

11    A.   I specifically instructed her that the

12 color did not matter.

13    Q.   Was there anything that would have

14 prevented you from instructing her that the color

15 did matter and that she -- you wanted an exemplar

16 vehicle the same color as Krystal's vehicle?

17    MR. JONES: Objection to form.

18       You may answer.

19    THE WITNESS: There was nothing that would have

20 prevented me from giving that instruction other

21 than it would be scientifically irrelevant.

22 BY MR. GARMER:

23    Q.   Who was the other person from Exponent

24 that was working on the file? You gave me the name

25 Dana Collins. Who else?

1    A.    I believe there's a gentleman in Phoenix.

2 I don't -- I think -- I know his first name is

3 Paul.  I don't recall his last name.

4    Q.    He's in Phoenix?

5    A.    Yes, sir.

6    Q.    And what does he do for Exponent in

7 Phoenix?

8    A.    Similar job description as Miss Collins.

9    Q.    Did he have anything to do with finding an

10 exemplar vehicle?

11    A.    He had started to do the search trying to

12 find it.  And then I believe he got tied up, and

13 Miss Collins finished it for us.

14    Q.    You have a series -- sorry to keep

15 reaching back and forth here.

16    A.    Not a problem.

17    Q.    In your series of photographs that we've

18 described, where were these photographs taken?

19    A.    The photographs that you are looking at

20 now of the exemplar Sebring were taken in the

21 parking lot outside the Pilot Station right at the

22 Morton's Gap exit.

23    Q.    Okay.  And when you say the Sebring that

24 we described, those are basically Photographs 0001

25 through 0008; is that right?

Page 46

1    A.    Those would be the eight-point external

2 shots of the vehicle, yes.

3    Q.    Yes.

4    A.    Assuming -- I can't read the numbers.  I'm

5 assuming your reading of the numbers are correct.

6    Q.    You're welcome to look over my shoulder

7 anytime you want.

8         Now, you have a TSI truck or trailer that

9 is photographed here.  Is this the exact trailer

10 that Mr. Ramirez was driving?

11    A.    My understanding of it is that it is an

12 exemplar trailer.  It's not the exact same trailer,

13 but it was chosen to match both the dimensions, the

14 markings, as well as the age of the trailer.

15    Q.    Do you understand that at the time of the

16 collision, the backup lights on the trailer were

17 not illuminated?

18    A.    There are no backup lights on the trailer.

19    Q.    So they were not illuminated?

20    A.    They don't exist.

21    Q.    And do you know if flashers existed on the

22 trailer in the back?

23    A.    The trailer is equipped with flashers.

24    Q.    And do you know if the flashers were

25 illuminated at the time of the collision?

1    A.    Based on the witness testimony as well as

2 the expert analysis, it is my understanding that

3 the flashers -- the four-way flashers were not

4 illuminated at the time of the incident.

5    Q.    And do you know whether the illumination

6 of the four-way flashers would have provided

7 additional visual cues for drivers on the roadway

8 such as Krystal?

9    MR. JONES:  Objection to form.

10         You may answer.

11    THE WITNESS:  Four-way flashers, if they were

12 present, would certainly serve as an additional

13 available visual cue for approaching drivers.

14 BY MR. GARMER:

15    Q.    How so?

16    A.    When we look at again in terms of

17 characterizing a hazard, you know, as a human

18 factors expert, I want to know what -- what does

19 that hazard look like, what information was

20 available to approaching drivers, and so we look at

21 everything.  What was the environment like?  What

22 were the conditions of the -- in this case, if the

23 hazard is a vehicle, what were the conditions of

24 the vehicle.  And to the extent that there were

25 lights or markings available, what were they and

1 what was their state.  So that's all information

2 that we would consider or that I would consider in

3 assessing the presentation of the hazard.

4     Q.   In your series of photographs, it appears

5 to be that there are photographs at 0341 through

6 0348 that appear to be photographs of the underride

7 bar of the exemplar TSI vehicle.  Is that a fair

8 statement?

9     A.   You know, again pending that you read the

10 numbers correctly, I'm unfortunately tethered and

11 can't get up to look over your shoulder.

12     Q.   I'll help you with your tethering.

13     A.   Thank you.

14          So looks like beginning with photograph

15 under the D16799 series of photographs,

16 Photograph 0339 through 0346 include measurements

17 and photographs or photographs of measurements of

18 the RUPS underride bar.

19     Q.   Of the -- what'd you call it?

20     A.   I believe it's rear underride protection.

21 The S is -- I think it might be system.  I'm not --

22     Q.   Yes.  You did not view the actual rear

23 underride protection system of the truck

24 Mr. Ramirez was driving, did you.

25     A.   No, I have not.

1     Q.    And are you aware that that rear underride

2 system is missing?

3     A.    That is consistent with my understanding

4 of the state of the incident underride bar.

5     Q.    And where did you get that understanding

6 from?

7     A.    I can't specifically recall.  I believe

8 it's been mentioned in some of the testimony.  I

9 think it was in Sergeant Craft's testimony, if I

10 recall.  They were asked -- there were questions

11 asked of him if he specifically remembers seeing it

12 on the night of the incident.  Do you mind if I

13 refer to that binder, please?  Thank you, sir.

14         So, yeah, on Page, looks like, 41 and 42

15 of Nathan Craft's, Sergeant Craft's deposition,

16 he's asked if he took pictures of the underride

17 bar, and then he finds those pictures.  And then

18 there's a question asked on Page 42.  It's come to

19 our attention in our investigation that the

20 underride bar is missing.  Do you know anything

21 about what may have happened to the underride bar

22 after you completed your investigation?  No, sir.

23         So I think that's where I got the

24 understanding that the bar was missing.

25     Q.    Did you talk with anybody who gave you any

1 information about what happened to the underride

2 bar?

3    A.    Not beyond that it's missing.

4    Q.    What I'd like to do is mark this whole

5 series of photographs that we've been discussing as

6 an exhibit to your deposition.

7    A.    If it's easier for you, Mr. Garmer, feel

8 free to remove anything from there.  However you

9 want to do it to make it easier is fine with me.

10    Q.    Okay.  And then we can just give it to the

11 court reporter.  You've got -- I assume you've got

12 copies of this is what you're telling me?

13    A.    Correct.

14    MR. GARMER:  What we have done is removed a

15 series of photographs as we have already talked

16 about their numbering, and we'll mark those as the

17 next numbered exhibit.  This is Exhibit Number 4.

18                    (WHEREUPON, Cades Deposition

19                     Exhibit No. 4 was marked for

20                     identification.)

21 BY MR. GARMER:

22    Q.    Moving through your file, I want to move

23 to another series of photographs which appear to be

24 taken at night.  They're marked DI6803-1 through-5.

25 Can you tell us what those photographs are and what

1 they're meant to depict?

2      A.    So as I noted in my report, on the date

3 when I visited the incident scene there was

4 construction going on.  It looked like they were

5 creating a whole new exit ramp there, and I wanted

6 to document the location of the various overhead

7 lights that were available, both the ones that were

8 on and weren't on.

9           Again, you know, based on the witness

10 testimony as well as some of the expert reports,

11 it's my understanding that the specific lighting

12 conditions the night of my visit to the site from

13 the artificial lights was not the same as it was

14 the night of the incident.  So I just wanted to

15 document that.

16      Q.    And how had it changed?

17      A.    If I could see that big binder, please.

18           It appeared that one of the overhead

19 luminaires that would have been active at the time

20 of the incident was inactive at the time of my

21 inspection.  So my understanding was that the

22 available ambient illumination at the time of my

23 inspection would have been less than what was

24 available at the time of the incident.

25      Q.    Now, the photographs that we just

1 identified here appear to show the area on the off

2 ramp; is that fair?

3     A.   Those pictures were taken from the edge of

4 the new ramp that they were building.

5     Q.   Yes.

6     A.   So right in the -- pretty close to kind of

7 what was the old gore area, but not actually on the

8 road.

9     Q.   And these photographs do not depict the

10 lighting conditions that were visible by Krystal on

11 the night of the collision, do they?

12     A.   So couple things.  Those photographs are

13 not meant to represent the lighting conditions as

14 they appeared.  Those photos are simply to just

15 identify the location of the luminaires and which

16 were -- and also identify which ones were on and

17 which ones were off at the time of my inspection.

18     Q.   So these photographs would not be used as

19 any kind of exhibit in your testimony, would they?

20     A.   Beyond the way I've already described

21 them, no.

22     Q.   Okay.  When you viewed the layout, if you

23 will, of the ramp and the intersection there at the

24 ramp, did you try to measure how far down from the

25 asphalt on the actual highway itself that the Pilot

1 Station was?

2    A.    No, sir, I did not.

3    Q.    You would agree that it was down

4 substantially from the highway itself?

5    MR. JONES:  Objection to form.

6    THE WITNESS:  It was -- it was down.  I mean, I

7 don't know if there's such a thing as a typical --

8 it was down a ways.  I don't know how to best

9 describe it.

10 BY MR. GARMER:

11    Q.    Was it down a 150 feet in elevation?

12    A.    I don't specifically recall the elevation

13 change.

14    Q.    But you wouldn't disagree with what I just

15 said; it was down at least 150 feet from the

16 elevation of the highway?

17    A.    You know, again I don't specifically

18 recall.  If you showed me a document that said

19 that, I probably -- you know, I wouldn't -- I would

20 be able to you evaluate and decide whether I agree,

21 but that doesn't sound crazy to me.

22    Q.    You would agree that the lighting from the

23 Pilot Station as it existed at the time you were

24 there provided no ambient lighting for the

25 interstate highway itself, did it?

1     A.    I would agree that the illumination

2 provided from the Pilot Station did not produce

3 appreciable, ambient illumination that would have

4 contributed to someone's ability to view or not

5 view an object on the interstate where this

6 accident occurred.

7     Q.    Thank you.  If I could say it as

8 eloquently as you did I would say it again, but I

9 can't.

10          Did you review the deposition of Casey

11 Bohn?

12     A.    No, I did not.

13     Q.    Have you been told the contents of his

14 deposition?

15     A.    I don't believe so, no.

16     Q.    Have you been told that he evaluated the

17 time that Mr. Ramirez was actually on the telephone

18 on the night of August 16 -- August 6th of 2016?

19     A.    I've seen that information in at least one

20 of his reports.  I think I have two of his reports.

21     Q.    And what have you seen in there?

22     A.    That he quantified the amount of time that

23 Mr. Ramirez was on the phone.

24     Q.    Do you recall him, Casey Bohn, quantifying

25 the fact that Mr. Ramirez, at least his telephone

1 was being used in a 17-minute period both before,

2 during and after, immediately after the collision

3 with Krystal White's vehicle?

4     A.    So I see reference in his June 28, 2017,

5 report that the -- you know, he references the

6 handset for the phone number (867) 169-3553

7 connected on the date of the incident from

8 8:46:36 p.m., and then the 17-minute duration,

9 Mr. Garmer, that you referenced ending at

10 9:03:59 seconds p.m., And then subsequent

11 connections beginning at 9:12:33 seconds p.m.

12     Q.    Did you take that testimony of Casey Bohn

13 to indicate that just immediately before, during

14 and immediately after the collision, Mr. Ramirez

15 was actually on the telephone?

16     MR. JONES:  Objection.

17     THE WITNESS:  To be clear, I'm not referencing

18 his testimony.  It's his report.  And my

19 understanding is that the -- that phone number was

20 given to your law firm as Mr. Ramirez's -- by

21 Mr. Ramirez during his deposition, and that the

22 timing of those calls -- that first call would be

23 prior to the accident ending right around the time

24 of the accident.

25

1 BY MR. GARMER:

2    Q.   Just after the collision?

3    A.   I don't recall specifically what the

4 testimony was whether it was just after or just

5 before.

6    Q.   What do you recall is the timing of the

7 phone call?

8    A.   This phone call according to Mr. Bohn

9 ended at 9:03:59 seconds p.m., and the --

10    Q.   Do you recall the time of the collision?

11    A.   The collision date and time is listed on

12 the police report as 21:02 which would be 9:02 p.m.

13 So as I stated before, those times are pretty

14 close; but without someone showing an analysis to

15 verify where those times came from, I couldn't tell

16 you.  And I haven't seen anyone else who could say

17 that specifically that the phone call had not ended

18 prior to the incident.

19    Q.   To be fair, you have not read Casey Bohn's

20 deposition?

21    A.   That is correct.

22    Q.   And you don't intend to?

23    A.   If it's provided to me, I'm happy to

24 review it and I will review it.  However, as far as

25 his analysis of and any testimony about

1 Mr. Ramirez's phone use has no bearing on my

2 analysis that I performed in this case.

3    Q.    As a human factors expert, do you analyze

4 and have you ever analyzed distracted drivers?

5    A.    Absolutely.

6    Q.    And is that a normal part of what a human

7 factors expert does in situations involving

8 collisions to try to analyze whether or not the

9 drivers involved in a collision have things going

10 on which would make them distracted?

11    A.    Certainly in the scope of a human factors

12 investigation of the state of a driver and driver

13 behavior, we would -- you know, any human factors

14 practitioner would absolutely assess anything that

15 might contribute to what we would describe as

16 someone's ability to operate a vehicle as a

17 reasonably alert and attentive person.

18    Q.    And you made no such evaluation of

19 Mr. Ramirez?

20    A.    Again as I've previously described,

21 whether -- you know, cell phone use as it pertains

22 to Mr. Ramirez had no bearing and does not affect

23 my analysis in this case.

24    Q.    Understand.  What I'm trying to get at is,

25 did you analyze it and then take it into account as

1 a human factors specialist.

2    MR. JONES:  Objection, asked and answered.

3        You can answer again.

4    THE WITNESS:  Again to the extent that I

5 reviewed information suggesting that Mr. Ramirez

6 was using a cell phone while operating his vehicle,

7 I certainly made note of that as far as it was

8 certainly information I considered as I reviewed

9 the file.  And as I've stated, it did not affect my

10 analysis in any way.

11 BY MR. GARMER:

12    Q.   But it did not affect it because you

13 didn't take it into account one way or the other?

14    MR. JONES:  Objection, asked and answered.

15        You can answer again.

16    THE WITNESS:  I'm pretty sure that's the

17 opposite of what I just stated.  I did, you know, I

18 did take it into account as I was reviewing the

19 information.  And in looking at the analysis I was

20 performing, that information had no bearing and did

21 not affect my analysis.

22 BY MR. GARMER:

23    Q.   Have you ever done any studies on

24 distracted drivers?

25    A.   Yes, sir.

1    Q.    Have you ever read the 2010 NITSA

2 evaluation of distracted drivers vis-a-vis cell

3 phone use?

4    A.    I've read many, many studies on distracted

5 driving as it relates to cell phone use.  If you

6 want to show me the specific publication, I don't

7 recall specifically.

8    Q.    What I'm talking about is National Highway

9 Safety Transportation Administration's 2010 study

10 on distracted drivers involving cell phone use.

11    A.    It certainly sounds like something I could

12 have read, but unless I look at it, I can't tell

13 you whether I've read that one or not.

14    Q.    Did you read it in preparation of your

15 testimony in this case and your opinions in this

16 case?

17    A.    No, sir, I did not.

18    Q.    Did you -- you made reference to the fact

19 that you have read Sergeant Craft's report of the

20 collision.  Is that a fair statement?

21    A.    Yes, sir.

22    Q.    And did you read Sergeant Craft's report

23 as to where on the roadway the collision actually

24 occurred?

25    A.    Yes, I did read that parts of his report.

1    Q.   Do you agree with Sergeant Craft's

2 analysis as to where the collision actually

3 occurred?

4    MR. JONES:  Objection, in the report or in his

5 deposition?

6    MR. GARMER:  Both.

7    THE WITNESS:  So again it is certainly outside

8 the scope of my expertise to perform an analysis to

9 determine the specific area of impact based on the

10 facts that Dr. Noll and Mr. Miller and

11 Sergeant Craft were considering.  You know, that

12 being said, in reviewing the materials from all

13 three of those individuals, I feel like I had a

14 good understanding of where this accident occurred.

15 BY MR. GARMER:

16    Q.   Sergeant Craft had said in his report, in

17 the right lane of I-69 I located a set of deep

18 gouge marks which indicated the point of impact.

19 Scattered through the area was debris from the

20 vehicle.  Looking at the point of impact and with

21 the length of the trailer, it appeared that the

22 vehicle had passed the exit and possibly stopped in

23 an attempt to make a sharp right turn onto the exit

24 ramp.

25         Do you disagree with those statements by

1 Sergeant Craft in his report?

2    A.   You know, again as I have stated,

3 certainly outside the scope of my expertise to

4 perform that type of accident area of impact

5 investigation.  He certainly stated that.  I

6 believe later after he spoke -- I believe, if I

7 recall correctly, this was written prior or that

8 description was his understanding prior to

9 Miss Oelschlager and Miss Whaley coming in and

10 mentioning to him that they saw the tractor and

11 trailer backing.

12        So I think later in his report he mentions

13 that after talking to the witnesses that his

14 understanding is that the tractor-trailer actually

15 stopped, backed and then proceeded to the right.

16    Q.   And, in fact, Sergeant Craft says in his

17 report, it appears he missed the Morton's Gap exit

18 ramp.  Witnesses observed the backing of the

19 northbound lanes on the interstate, the witness.

20 The vehicle then stopped in the roadway and slowly

21 began to make a sharp right turn to take the exit.

22        Did you take all those statements by

23 Sergeant Craft as fact in your analysis?

24    A.   Those statements are certainly consistent

25 with my general understanding of what happened in

Page 62

1 the accident.

2     Q.   And then in speaking about Krystal's

3 vehicle and its actions, it said, the vehicle

4 struck at a slight angle which may have been a last

5 attempt to avoid the collision.

6          Do you agree that Krystal's vehicle was at

7 a slight angle at the point of impact?

8     A.   Again that's consistent -- so the

9 orientation of -- my understanding based on

10 reviewing Mr. Miller, Dr. Noll and Sergeant Craft's

11 materials is that the impact orientation between

12 the rear of the trailer and Miss White's vehicle

13 was at an angle.

14     Q.   That's consistent with your analysis?

15     A.   Again, I've not performed an analysis to

16 determine that.  I am simply relating my

17 understanding the analysis performed by those

18 qualified to perform that analysis.

19     Q.   Help me understand, because as I

20 understand it, you have done a -- you have done an

21 animation where you have attempted to show what

22 the -- what it was that Krystal White was able to

23 observe as she approached the Morton's Gap exit and

24 what she was able to see and why she should have in

25 your testimony been able to avoid the collision; is

1 that true?

2    MR. JONES:  Objection, compound question.

3        You may answer.

4    THE WITNESS:  No, sir.

5 BY MR. GARMER:

6    Q.   Tell me why that statement is not true.

7    A.   I have not made any animation.

8    Q.   Have you made any analysis of the point of

9 impact?

10    A.   I have not made any independent analysis

11 of the point of impact again beyond reviewing the

12 information analysis of the three accident

13 reconstructionists involved in this case.

14    Q.   Have you taken Sergeant Craft's report

15 then as face value?

16    MR. JONES:  Objection.

17        You may answer.

18    THE WITNESS:  Again based on my review,

19 Sergeant Craft's analysis is -- in terms of the

20 information that's important for my analysis,

21 Sergeant Craft's analysis is consistent with

22 Mr. Miller's analysis and consistent with

23 Dr. Noll's analysis with respect to the general

24 orientation of the vehicles and the general area of

25 impact, and those are things that I considered in

1 performing my analysis.

2 BY MR. GARMER:

3    Q.    How would you describe where the point of

4 impact was with reference to I-69 and to, more

5 importantly I think you used the term, the gore on

6 the highway?  And if you would explain what you

7 mean by the term gore.

8    A.    Sure.  The -- my understanding is that

9 this accident occurred in the right travel lane

10 of --

11    Q.    I-69.

12    A.    -- northbound I-69 right near the Morton's

13 Gap exit.

14           And that the point of impact -- I don't

15 recall specifically.  It was described as right

16 near that fore point which is the point at which

17 the highway proceeds in one direction and the exit

18 ramp proceeds in the other, and you've got this

19 sort of triangular area.  So it's right in the

20 vicinity of that area.

21           And I believe that both Mr. Miller and

22 Dr. Noll have pictures in their report that show

23 the point of impact to be to the south of the

24 beginning of the white lines of the gore point.

25    Q.    How far to the south?

1    A.    I don't know.

2    Q.    Sergeant Craft indicated when he

3 interviewed Mr. Ramirez, that Mr. Ramirez said he

4 heard the impact, and then he moved the truck

5 200 yards down the exit ramp.  Did you read that

6 testimony?

7    MR. JONES:  Objection.

8    THE WITNESS:  I recall that Sergeant Craft

9 testified that Mr. Ramirez did suggest to him that

10 he heard something and then moved the

11 tractor-trailer some distance.  I don't recall the

12 specific distance.

13 BY MR. GARMER:

14    Q.   As a human factors expert, can you explain

15 to us why a driver of an 18-wheeler would hear what

16 he thought was an impact with his vehicle and then

17 move his vehicle almost 200 yards after what he

18 heard he thought was an impact?

19    A.    So my understanding of Mr. Ramirez's

20 account is that he heard something and that he

21 wasn't sure what it was when he heard it.  I

22 believe there was some reference that it may

23 have -- he thought it may have been a tire blowing

24 out.  So at that point for him to move the vehicle

25 is not unreasonable.

Page 66

1    Q.    Is that a human factors opinion that

2 you're going to present to the jury?

3    A.    That is how I would answer that question

4 if asked.  It's certainly not -- that question was

5 not something I considered in the analysis I

6 performed in the scope of my report.

7    Q.    Does that analysis come within the realm

8 of human factors expert or is that outside your

9 realm?

10    A.    Again, in the answer to the question that

11 you posed and I answered, that is certainly within

12 the realm of my expertise.

13    Q.    Well, do you intend to offer that as your

14 opinion?

15    A.    And again as I've stated, the scope of my

16 analysis as contained in my report does not address

17 that.  That's not a question that was relevant to

18 what I was analyzing in this case.  To the extent

19 that I am asked that question, I would certainly

20 answer it.

21    Q.    As a human factors expert, did you analyze

22 whether or not you believed that at and shortly

23 before the time of the collision, Mr. Ramirez

24 considered himself lost?

25    A.    The -- I reviewed Mr. Ramirez's testimony

1 in this matter.  I do recall some mention of him

2 being on the wrong road.  I don't recall

3 specifically the word -- whether or not the word

4 lost in that characterization was used.  However,

5 like I said, I reviewed that deposition, but that

6 information is not relevant to the analysis that I

7 performed.

8      Q.   But did you consider him to be lost in

9 your review of the information?

10     A.   Again, it's my understanding that in some

11 way, shape or form he was not on the road he

12 intended to be on.  And again I don't recall

13 specifically a characterization of lost or not, and

14 that does not affect my analysis, and I don't have

15 an opinion about that.

16     Q.   Do you teach any kind of driver's courses?

17     A.   I have in the past given many

18 presentations as well as I have given -- yeah.  I

19 have given seminars on general human factors, and

20 in those seminars we have talked or I have talked

21 about the human factors as it pertains to driver

22 behavior.

23     Q.   And can you cite to those seminars in your

24 CV?

25     A.   I don't believe so.

1    Q.    I think we took those out and put them

2 somewhere.

3    A.    I believe it's under the pile.

4          The seminars that I'm thinking of are not

5 mentioned here.

6    Q.    Could you provide us with those seminars

7 and the cites to those seminars?

8    A.    To the extent I remember them, absolutely.

9    Q.    Do you think you may have copies of them

10 at your -- in your office here?

11    A.    I don't specifically recall.

12    Q.    Would you search and see if you have those

13 and provide those to us?

14    MR. JONES:  Again, please place your requests

15 in writing.  We'll consider your requests.

16 BY MR. GARMER:

17    Q.    Let me take a look at your file again, if

18 I may.

19    A.    Absolutely.

20    THE WITNESS:  Would it be possible to take a

21 short break?

22    MR. GARMER:  Yes, sir.  As I said, anytime

23 anybody wants to call a timeout, it's your call.

24    VIDEOGRAPHER:  We are off the record at

25 10:53 a.m.

1              (WHEREUPON, a short recess was

2              taken.)

3    VIDEOGRAPHER:  We are back on the record at

4 11:00 a.m.

5    MR. GARMER:  Let's mark the photographs that

6 were taken of the exit ramp that are five in number

7 as Exhibit Number 5, I believe.

8              (WHEREUPON, Cades Deposition

9              Exhibit No. 5 was marked for

10              identification.)

11 BY MR. GARMER:

12    Q.   Other than your one visit to Kentucky when

13 you were at the Morton's Gap exit, have you ever

14 visited Kentucky?

15    A.   Many times.

16    Q.   How so?

17    A.   I've had other work down there, and I also

18 have family in the area.

19    Q.   In -- actually in the Commonwealth?

20    A.   In Louisville.

21    Q.   What other work have you done in Kentucky?

22 Let me make it easier.

23         On any of the cases that you've listed on

24 your CV, does that involve work in Kentucky?

25    A.   You're talking about my testimony list?

1    Q.    Yes.

2    A.    So one of the trials was in -- it was

3 jurisdiction in Indiana, but I can't recall if the

4 incident location was in Kentucky or not.   It

5 was -- I know the court was in New Albany, Indiana,

6 right over the border from Louisville.

7    Q.    Do you remember who the lawyer was that

8 you worked with in that particular case?

9    A.    The law firm was Goldberg Simpson, I

10 believe, and the attorney I was working with was a

11 gentleman named Jared Key.

12    Q.    Okay.   Other than that, have you done any

13 work in Kentucky that you can recall?

14    A.    I know I've been retained on at least one

15 other case in Kentucky.   I don't specifically -- I

16 don't even recall the name of that case, but I know

17 I've been to Kentucky for work before.

18    Q.    Do you remember the lawyer that you worked

19 with?

20    A.    If it's the case I'm thinking of, again

21 I'm not a hundred percent sure that it was in

22 Kentucky, but I had a case with John Dunn at

23 Reminger.

24    Q.    So you have been involved with Reminger in

25 other cases?

1    MR. JONES:  Objection to form.

2        You can answer.

3    THE WITNESS:  Yes, sir, I have.

4 BY MR. GARMER:

5    Q.    And you mentioned John Dunn, and you've

6 been involved in at least one other case with John

7 Dunn?

8    A.    That's to the best of my recollection.

9    Q.    Anymore besides that?

10    A.    You know, over the years there may have

11 been one other, but I don't specifically recall.

12    Q.    And do you remember what that case

13 involved?

14    A.    The one case that I remember was an

15 accident involving a tractor-trailer.

16    Q.    What were the facts of that case?

17    A.    I honestly don't remember.

18    Q.    Did you testify on behalf of the plaintiff

19 or the defendant?

20    MR. JONES:  Objection.

21    THE WITNESS:  I did not offer testimony in that

22 case.

23 BY MR. GARMER:

24    Q.    How long ago was that?

25    A.    A year, two years, maybe three.  Some one

1 to three years.

2    Q.    Did you make a report in that case?

3    A.    I may have.  I don't know.  Again, you

4 know, to the extent that I've done other work on

5 specific cases, they're all subject to

6 confidentiality agreements until such a point that

7 they're publicly disclosed.

8    Q.    Right.

9    A.    And I don't -- I certainly don't know the

10 status of any disclosure.  That being said, I

11 believe I wrote a report, but I'm not sure as I sit

12 here right now.

13    Q.    And that's why I'm asking the question the

14 way I'm asking it because I want to -- if you have

15 given a report, then it indicates that you have

16 been disclosed and that is discoverable.

17    MR. JONES:  Objection.  Bill, that's not true.

18    MR. GARMER:  Well --

19    MR. JONES:  Reports are issued all the time

20 without experts being disclosed.

21    MR. GARMER:  So that's why I asked the

22 question.

23         Would you check to see if you have done a

24 disclosure in that case in which you worked with

25 Mr. Dunn, and if you have, would you provide us

1 with a copy of that disclosure?

2     MR. JONES:  Just put your requests in writing

3 and we'll consider it.

4 BY MR. GARMER:

5     Q.    Have you done any other work on behalf of

6 lawyers at Reminger?

7     A.    Not to the best of my recollection, no.

8     Q.    Is this the first time you've worked with

9 Mr. Jones?

10     A.    Yes, sir.

11     Q.    Have you done any work on behalf of TSI

12 before this case?

13     A.    No, sir.

14     MR. GARMER:  In your file you have provided us

15 with a drawing which is entitled, The Incident, and

16 I want to mark this as the next numbered exhibit.

17                    (WHEREUPON, Cades Deposition

18                     Exhibit No. 6 was marked for

19                     identification.)

20 BY MR. GARMER:

21     Q.    And if you would explain to us what this

22 is supposed to depict.

23     A.    That is a diagram that was prepared so

24 that I could easily remember the relative order and

25 the relative positions of the vehicles.  It's not

1 to scale.  None of the orientations or anything

2 have any particular meaning and are not based on

3 any measurements.  It's simply so I could remember

4 easily which vehicle came in which order.

5     Q.   Any other use you made of that diagram

6 other than what you've described?

7     A.   No, sir.

8     Q.   The next thing that you have in your file

9 is it looks like an astronomical chart, and we'll

10 mark that as the next numbered exhibit and ask you

11 what the purpose of that is.

12                    (WHEREUPON, Cades Deposition

13                    Exhibit No. 7 was marked for

14                    identification.)

15    THE WITNESS:  When evaluating nighttime cases,

16 I'm often asked about any potential role that light

17 from the moon might play.  And so in assessing

18 that, one of the tools that I bring to bear is

19 getting an understanding of exactly where the moon

20 was.

21        The question is easiest answered sometimes

22 when the moon's not even above the horizon, but so

23 these tables -- this table we have in Exhibit 7

24 here is an altitude and Azimuth table for the date

25 of the incident in Morton's Gap, Kentucky, which

1 tells us both the altitude, the height, as well as

2 the lateral position of the moon relative to in

3 this case east of north.

4                    (WHEREUPON, Cades Deposition

5                     Exhibit No. 8 was marked for

6                     identification.)

7 BY MR. GARMER:

8    Q.    Okay.  And then the next numbered exhibit,

9 would you explain that for us?

10    A.    This is another set of astronomical data.

11 Again this is for the incident date, Morton's Gap,

12 Kentucky.  And when assessing these nighttime

13 incidents, it's important to, for my analysis, to

14 know whether or not there was any ambient

15 illumination from the sun.  And so in order to get

16 an understanding of that ave, it's important to

17 know exactly relative to the travel of the sun when

18 the accident occurred.  And so this gives me the

19 time specifically of sunset, the end of twilight,

20 as well as, you know, it does describe moon phase

21 to the extent that I'm asked about that.

22    Q.    And was there any sunlight at the time of

23 the collision?

24    A.    No, sir, there was not.

25    Q.    And was what -- what would you describe

1 the time as it being at the time of collision?

2    A.   Again based on the police report, I think

3 they have 9:02 p.m. marked.  So, you know, within a

4 few minutes around there I would imagine is when

5 the collision occurred.

6    Q.   Right.  What would you describe that as

7 the position of the moon?

8    A.   At that time the position -- I'm sorry.  I

9 lost you.  Can you ask that again?

10    Q.   What would you describe that you found

11 would be the position of the moon at the time of

12 the collision?

13    A.   So at the time of the collision, the moon

14 was in the process of coming down or reducing in

15 altitude from -- it was probably closest to

16 12.2 degrees which is what it's noted at 9 p.m.,

17 and it was 2 -- roughly 260 degrees east of north.

18 So that would be the relative position of the moon

19 at that time.

20    Q.   Would that -- the position of the moon be

21 towards the direction that Krystal was traveling or

22 in back of the direction she was traveling?  How

23 would you describe the position of the moon?

24    A.   I think that if you're 260 degrees east of

25 north, that the moon would be -- if you're

1 traveling northbound, the moon would be basically

2 to the west, slightly southwest.

3    Q.    And in Krystal's rear-view mirror?

4    A.    Again it would be to the southwest of the

5 sky.  So if you're driving northbound, it would be

6 either, you know, depending on exact -- I think the

7 road there is pretty well straight north, but it

8 would be somewhere to the left or back left.

9    Q.    In your opinion did the moon provide any

10 illumination at all?

11    A.    The moon provides illumination.

12    Q.    Did it on the evening of August the 6th of

13 2016 provide illumination, and did you take that

14 into account in your analysis?

15    A.    So for those two questions, the first

16 part, did the moon provide illumination, yes.  Did

17 I take that into account in my analysis, yes.

18    Q.    How did you take it into account?

19    A.    The moon doesn't matter.

20    Q.    And why not?

21    A.    So in any area where you have artificial

22 lighting of any kind, even minimal artificial

23 lighting, it has been shown that any appreciable

24 ambient illumination from the moon is washed out or

25 overcome by local, artificial, ambient

1 illumination.

2        So when considering the ambient

3 illumination from the moon as it relates to a

4 person's ability to see things in the environment,

5 it only really matters in areas where there's no

6 other source of illumination.

7    Q.    In other words, as air traffic controllers

8 might say, the moon was not a factor in this case?

9    A.    I would agree with that statement.

10    Q.    The next exhibit that you have in your

11 file are the luminaries most likely present and

12 active on August the 6th of 2016, and I'll mark

13 those as the next numbered exhibit, two pages.

14                    (WHEREUPON, Cades Deposition

15                    Exhibit No. 9 was marked for

16                    identification.)

17 BY MR. GARMER:

18    Q.    Tell me what that exhibit shows us.

19    A.    So as I described earlier, there was a

20 discrepancy between what overhead lighting was

21 present and on at the time of the incident versus

22 what was present and active at the time of my

23 inspection.  And so I gathered information as to,

24 you know, based on the testimony, historical data,

25 looking at sources like Google Earth as well as

1 photographs from the time of the accident to

2 determine likely where the nearest light sources

3 were to get an understanding of whether or not they

4 might provide illumination that would be relevant

5 in looking at the visibility and conspicuity of the

6 area in this incident.

7     Q.    And once again was the moonlight a factor

8 in this analysis?

9     A.    Again because of the presence of these

10 lights is the primary reason the moon is not a

11 factor in this incident.

12     Q.    Okay.  Next I'm going to hand you the next

13 numbered exhibit which appears to be a rough

14 drawing of the Morton's Gap exit and I-69.  We'll

15 mark that as the next numbered exhibit, and if you

16 would identify that for us.

17                    (WHEREUPON, Cades Deposition

18                     Exhibit No. 10 was marked for

19                     identification.)

20     THE WITNESS:  So again because of the

21 construction present at the time of my inspection

22 and knowing that that essentially meant that it

23 would be different than the time of the incident,

24 I -- in addition to the photographs that we talked

25 about earlier, this drawing was to memorialize both

1 the location and the status of the overhead lights

2 in and around the area of the incident.

3 BY MR. GARMER:

4    Q.   Is there anything in particular about

5 those notes that you rely on?

6    A.   Other than remembering, you know, which --

7 where the lights were, how much light they gave

8 off, and what was on and what wasn't.

9    MR. GARMER:  Okay.  Next numbered exhibit,

10 would you mark that?

11                    (WHEREUPON, Cades Deposition

12                    Exhibit No. 11 was marked for

13                    identification.)

14 BY MR. GARMER:

15    Q.   And would you identify that?

16    A.   This is what I refer to as a critical

17 stopping distance sheet.  Again, I relied on the

18 calculations of Dr. Noll with respect to the

19 braking capability of a vehicle such as

20 Miss White's, and this sheet helps me look at how

21 the distance and time are required for any given

22 vehicle and driver to stop.

23    Q.   Have you calculated where exactly Krystal

24 White's vehicle was with relation to the 18-wheeler

25 when she could first, in your opinion, possibly

1 observe the 18-wheeler?

2    MR. JONES:  Objection, form.

3        You may answer.

4    THE WITNESS:  I wouldn't describe it as a

5 calculation.  However, the testimony and analysis

6 that I completely agree with having been at the

7 site is that there were unobstructed sight lines

8 for well over a thousand feet.  I've seen estimates

9 from anywhere from, you know, a thousand to even

10 2,000 feet.  And given the lighting on the trailer,

11 it's at, you know, that sight line distance is when

12 that trailer would first be available to be

13 observed to an approaching driver.

14 BY MR. GARMER:

15    Q.   Even in the dark?

16    A.   I didn't consider anything except for the

17 relatively low illumination of this incident.

18    Q.   Well, how would you describe the lighting,

19 the ambient lighting available on that sight line

20 that you've just described?  How would you describe

21 it?  Was it bright as noonday sun or was it dark as

22 midnight?

23    A.   Neither.

24    Q.   Okay.  I gave you two possibilities, but

25 I'd like you to expand and tell me what -- how you

1 define it.

2     A.   It was an area, as I've stated, of

3 relatively low illumination.  It was nighttime.  It

4 was dark.  There was some ambient illumination on

5 the roadway from the luminaires that Dr. Francis

6 identified in her report and others have commented

7 on as well, you know, and at least some of them I

8 observed when I was at the scene.  Those -- in

9 terms of ambient illumination, those would be the

10 sources of ambient illumination for the environment

11 at the time of the incident.

12     Q.   How far down the highway is it your

13 opinion that Krystal could have identified the

14 truck given the lighting conditions?

15     MR. JONES:  Objection, asked and answered.

16          You can answer again.

17     THE WITNESS:  Again, you know, so given the

18 lighting conditions and accepting the unobstructed

19 sight lines as described by the other witnesses and

20 experts in this case, a driver approaching from the

21 south would -- the trailer would be available to be

22 seen and could be seen from, you know, those -- I

23 have no problem with those distances of a thousand

24 feet, you know, and again if 2,000 feet as I've --

25 I can't recall if that was Miller or Francis who

1 used that number.  But, you know, if that's the

2 number that's there, then that's fine.  And I have

3 no problem and I agree with that number.

4 BY MR. GARMER:

5      Q.   At what point would a driver such as

6 Krystal be able to discern that the truck was, in

7 fact, either backing up or not moving or barely

8 moving when she was first able to discern the

9 truck?

10     A.   If I could have the binder, please.

11     Q.   There you go.

12     A.   Thank you, sir.

13          So a reasonably alert and attentive driver

14 in the position that Miss White was approaching

15 from would have at a absolute minimum be able to

16 discern the state and the actions of that trailer

17 from no closer than 365 feet away and likely much

18 further than that.  But 365 feet is a absolute

19 minimum, con -- super conservative, sorry, just

20 conservative analysis that is based solely on one

21 visual cue called looming.

22     Q.   She is -- 365 feet is roughly the length

23 of a football field, a little further, correct?

24     A.   It's a little longer than a football

25 field.

1    Q.   Football field is 360 yards or -- yeah.

2    MR. JONES:  Hundred yards.

3 BY MR. GARMER:

4    Q.   Hundred yards, am I correct?

5    A.   That's my understanding, not including the

6 end zones.

7    Q.   Not including the end zone.

8         And so your testimony is that the -- that

9 Krystal could have observed the truck at just

10 further than the length of a football field?

11    MR. JONES:  Objection, form.

12         You may answer.

13    THE WITNESS:  No.

14 BY MR. GARMER:

15    Q.   Tell me how you would correct that.

16    A.   So as we've already talked about, the

17 truck, or the trailer specifically, was available

18 to be seen and had sufficient conspicuity to be

19 seen by an alert and attentive driver at something

20 on the order of over a thousand feet, whatever that

21 unobstructed sight line distance was.  So that is

22 when the trailer would be available to be seen and

23 able to be seen by an alert and attentive driver

24 approaching from the south.

25

1 BY MR. GARMER:

2    Q.   What was the rise of the roadway at that

3 period of time?  It wasn't flat, but how far -- and

4 it went up.  How did it go up?  At what angle?

5    A.   I did not specifically measure the angle.

6 However, at my site inspection, I performed

7 multiple drives through that area in both daylight

8 and at night in the exemplar Sebring to get a sense

9 of when I could see the area of where the exit is.

10 And it was again -- you know, I didn't specifically

11 measure it other than to say it was well over a

12 thousand feet.

13    Q.   You could have measured it?

14    A.   Correct.

15    Q.   There was nothing to prevent you from

16 doing that?

17    A.   Correct.

18    Q.   And did you calculate -- do you agree with

19 me that there was -- there is a rise in the roadway

20 in that area that the road actually raises in its

21 elevation?

22    A.   My --

23    Q.   It's not -- in other words, it's not flat.

24 It's rising up?

25    A.   My recollection is that as you approach

1 from the south, there is a rise to the road.  It

2 was not a rise that would obstruct sight lines from

3 a driver in a 2008 Sebring approaching that area in

4 as much a way that would contribute to my analysis

5 in this incident.

6     Q.   Given that there was a rise in the

7 roadway, did you attempt to calculate how that

8 would affect a driver's visualization of a vehicle

9 on that roadway?

10    MR. JONES:  Objection, form.

11         You can may answer.

12    THE WITNESS:  Again, in -- prior to going out

13 there, I was already aware based on using Google

14 Earth and other testimony that there was this

15 slight rise.  I was also aware and under the

16 understanding that the sight lines approaching

17 were, as I've stated, you know, on the order of a

18 thousand feet, if not, more.

19         So with that understanding, when I did

20 these drive-throughs what I was looking for is how

21 did the area -- again, not the lighting

22 specifically because I knew it had changed, but,

23 you know, geometrically, how did that area appear

24 as I was driving up in this exemplar vehicle from

25 the south.  And what I found was that the rise in

1 the roadway did not contribute to or did not do

2 anything to inhibit someone's ability to -- a

3 reasonably alert and attentive person's ability to

4 perceive, react and attempt to avoid this accident.

5 BY MR. GARMER:

6     Q.    Does a rise in the roadway affect

7 conspicuity?

8     A.    In this specific case as it pertains to

9 the conspicuity of the trailer as we look at it

10 from a perspective of perceiving and reacting to it

11 to avoid it, no.

12    Q.    At what level do you have to have a rise

13 in the roadway that will affect conspicuity?

14    A.    To the extent that that rise or hill or

15 change in roadway geometry becomes an obstruction,

16 a visual obstruction, or prevents a person in a

17 certain position from seeing something, then it

18 would affect the conspicuity of that thing that you

19 can't see.

20    Q.    What I'm talking about is does the rise in

21 the roadway, and we may be using the same terms or

22 maybe not, affect a driver's perception of distance

23 on a vehicle that's on the rise or somewhere in the

24 rise?

25    A.    I am not aware of any specific studies

1 that would show or that speak to, you know, how an

2 incline might affect someone's perception.  That

3 being said, to the extent that that incline affects

4 the availability and appearance of visual cues

5 certainly could affect our human's ability to

6 perceive size, speed and distance.

7     Q.    You have said that Krystal, in your

8 opinion, should have been able to observe the truck

9 at 360 yards away?

10    MR. JONES:  Objection to form.

11         You may answer.

12 BY MR. GARMER:

13    Q.    Is that a fair statement?

14    A.    No, sir.

15    Q.    Tell me what you said.

16    A.    So --

17    Q.    You said at minimum 365 yards away?

18    MR. JONES:  Objection.

19         You may answer.

20 BY MR. GARMER:

21    Q.    Go ahead.

22    A.    No, I didn't.

23    Q.    Tell me what you said.

24    A.    What I said was that the trailer was

25 available to be seen given the unobstructed sight

1 lines and the conspicuity of that trailer at

2 distances from a thousand feet or more.  And I also

3 said that an approaching driver at a minimum, at an

4 absolute shortest distance, would be able -- an

5 alert and attentive driver would be able to

6 perceive that that trailer and tractor were stopped

7 or slow moving at a distance of at least 365 feet

8 away.

9      Q.    Okay.  Krystal, according to all of the

10 evidence that we have, at 360 feet away from the

11 truck was driving her vehicle at 71 miles per hour.

12 Do you agree with that?

13     A.    There -- I know at some point the vehicle

14 image data of the download said it was -- she went

15 from 74 then to 71, so I do -- I think that's

16 correct that that distance it was 71 miles an hour.

17     Q.    And at 71 miles an hour, what would be the

18 closing speed for 360 yards?

19     A.    At 71 miles an hour, at --  it's 104 feet

20 per second.  So 360 yards is roughly, I mean,

21 that's close to a thousand feet.  So it's like

22 10 seconds.

23     Q.    10 seconds?

24     A.    For 360 yards.

25     Q.    And have you calculated that?

1    A.    I mean, I did just a rough estimation, but

2 360 yards was not a number relevant to my analysis.

3    Q.    And what do you have in your analysis?

4    A.    You know, again, when looking at an

5 avoidance scenario, there are three things that

6 matter.  The first being the cues available and the

7 environment so we've talked about that.  Then there

8 needs to be a determination of, at a given speed,

9 how -- or sorry.  There needs to be a determination

10 of, given those cues and the environment, how

11 quickly would you -- would we expect a reasonably

12 alert and attentive driver would be able to react.

13 During that process the vehicle's still moving, so

14 there's a time associated with that.

15        And then the third component is what could

16 the vehicle do once that reaction starts.  So once

17 you hit the brake pedal, once you turn the steering

18 wheel, and so for that we rely on or I relied on

19 the analysis of Dr. Noll.  And what all that allows

20 me to do is come up with how much time and distance

21 would be required for a driver to either brake

22 their vehicle to a stop or move around a hazard at

23 a certain location.

24    Q.    You agree that the -- that the report of

25 Sergeant Craft shows that Krystal took some evasive

1 action, do you not?

2      A.    My understanding is that again based on

3 the vehicle image, the download, I think it was --

4 I think this one's the air bag control module or

5 the electronic data recorder, I always use those

6 incorrectly, that showed that it was -- I think it

7 was 0.6 or 0.7 seconds prior to the air bag

8 deployment, there was a braking event.  And the

9 impact configuration led Sergeant Craft to believe

10 that there was a potential left steering input.

11      Q.    And you would agree that all that shows

12 that Krystal attempted to take some evasive action?

13      A.    That information does suggest that

14 certainly not at the point at which we would expect

15 a reasonably -- at which I would expect a

16 reasonably alert and attentive driver to, but at

17 some point there were actions taken.

18      Q.    May I see your -- the book again, sir?

19      A.    Not a problem.

20           MR. GARMER:  Thank you.

21           The next thing that you have, the next

22 table that you have, we'll mark as exhibit the next

23 numbered exhibit.

24

25

Page 92

1                    (WHEREUPON, Cades Deposition

2                    Exhibit No. 12 was marked for

3                    identification.)

4 BY MR. GARMER:

5    Q.    Would you tell us what that is?

6    A.    Sure.  These are lane change calculations.

7 And again, you know, for these numbers I relied on

8 Dr. Noll's input.  And this is basically giving me

9 information on, at a given speed, how much time and

10 how many longitudinal feet would be required for a

11 lateral avoidance maneuver.

12   Q.    Tell us what you calculated there.

13   A.    If I could see that binder there, please.

14 Thank you.

15         So at a speed of 71 miles an hour, it

16 would take approximately 2.5 to 3 seconds or 260 to

17 300 feet to initiate and complete a lateral

18 steering maneuver to avoid the tractor-trailer.

19   Q.    Okay.  Is that all that calculation shows

20 us?

21   A.    Yes, sir.

22   Q.    Okay.  What's your next calculation?  Your

23 next --

24   A.    To make this easier, if you don't mind,

25 I'm just going to take my report out of here for

1 now.

2     Q.    That would be great.

3     A.    As much fun as I'm sure we're both having.

4     Q.    Thank you.

5          The next thing you have in your folder is

6 a -- looks like a disk or DVD.  What is that?

7     A.    Those are copies of the videos that I made

8 at my inspection.  That disk -- so those would be

9 the videos of the drive through the incident area.

10 I'm pretty sure I did both night and day

11 recordings.  I don't -- but I don't specifically

12 recall.  It's just videos of, from the exemplar

13 Sebring, driving through the incident area.

14     MR. GARMER:  Do we have some way we can make

15 copies of that?

16     MR. JONES:  Yeah, we can.  I don't know if we

17 can do it right now, but, you know, we can.

18     MR. GARMER:  Put it on a thumb drive or --

19     MR. JONES:  Oh, yeah, absolutely.

20     MR. GARMER:  And if we can do that and give

21 that thumb drive to the reporter.

22     MR. JONES:  Actually at a break -- off the

23 record.

24     VIDEOGRAPHER:  We're off the record at

25 11:41 a.m.

Page 94

1                    (WHEREUPON, a discussion was had

2                     off the record.)

3                    (WHEREUPON, Cades Deposition

4                     Exhibit No. 13 was marked for

5                     identification.)

6    VIDEOGRAPHER:  We're back on the record at

7 11:42 a.m.

8 BY MR. GARMER:

9    Q.   The next document in your file is, looks

10 like, sun and moon data for one day.  Is that

11 duplicative of what we already had?

12    A.   So it looks like this was from -- this was

13 for a different day, the last one we looked at was

14 for the incident day.

15    Q.   Yeah.

16    A.   This was for November 13 and was for

17 Nashville.  So this was the sun and moon data for

18 the second inspection that I performed.

19    Q.   Okay.  In Nashville?

20    A.   Yes, sir.

21    Q.   And when did you perform that inspection?

22    A.   November 13, 2017.

23    Q.   And what was the purpose of your second

24 inspection?

25    A.   The purpose of the second inspection was

1 to use a calibrated photography method to document

2 the appearance of the rear of an exemplar trailer

3 of the same marking type, size, color and age, as

4 the incident trailer under similar lighting

5 conditions to then produce photographs that are

6 based on a state of the art, scientifically

7 court -- scientifically validated, court accepted

8 methodology of being able to produce photographs

9 that you can give to someone else and say this is

10 what it looked like when I was there.

11    Q.   Okay.  And this was done on November the

12 13th of 2017?

13    A.   Yes, sir.

14    Q.   Just before Thanksgiving?

15    A.   Yes, sir.

16    MR. GARMER:  And we'll mark this as the next

17 numbered exhibit as to the moon phase on that date

18 that you did these photographs.

19                    (WHEREUPON, Cades Deposition

20                    Exhibit No. 14 was marked for

21                    identification.)

22 BY MR. GARMER:

23    Q.   Following that exhibit is the next

24 exhibit, and if you would describe what that is.

25    A.   At the inspection in Tennessee, I used a

1 device called a retroreflectometer to measure the

2 retroreflective properties of the conspicuity tape

3 on the back and on the sides of the exemplar

4 trailer.

5      MR. GARMER:  Okay.  We'll mark that as the next

6 numbered exhibit.

7 BY MR. GARMER:

8      Q.    The next numbered exhibit is a four-page,

9 both front and back, and would you describe what

10 those are?

11     A.    So these are the raw values that were read

12 off of the retroreflectometer as to the

13 retroreflectance measurements that were taken in

14 various locations on the back and side of the

15 trailer where the conspicuity tape was, as well as

16 measures of the ambient illumination at the

17 location that the calibrated photographs were

18 taken.

19     MR. GARMER:  Then the next numbered exhibit --

20 mark that, and then we'll tell you -- tell us what

21 that is.

22                    (WHEREUPON, Cades Deposition

23                     Exhibit No. 15 was marked for

24                     identification.)

25

Page 97

1                    (WHEREUPON, Cades Deposition

2                     Exhibit No. 16 was marked for

3                     identification.)

4                    (WHEREUPON, Cades Deposition

5                     Exhibit No. 17 was marked for

6                     identification.)

7     THE WITNESS:  So when I take a photograph, it

8 gets a file name.  And then when we bring them back

9 in and log them into our system, it gets a

10 different file name.  As part of the calibrated

11 photography method, I utilize multiple photographs

12 to create the calibrated image.  And so this sheet

13 is just linking the file names from before and

14 after they were logged.

15 BY MR. GARMER:

16     Q.    Where are the photographs?

17     A.    Looks like they're on the next tab in my

18 binder.

19     Q.    Okay.  And these photographs look like

20 they start at D16970-001 and go to D16970-058; is

21 that correct?

22     A.    Again assuming you read the numbers

23 correctly, I have no reason do disagree with that.

24     Q.    I'll give them to you to double-check.

25     A.    They go from 001 to 058.

1   Q.   Now, explain to us what that is and what

2  it means to you and how you intend to use that in

3  your testimony.

4   A.   So the first number of photos are of the

5  exemplar tractor and trailer that I used at that

6  second inspection including some of the dimensions

7  and locations of the conspicuity tape, and then the

8  next set of photographs are the raw images that

9  were used to create the calibrated photographs that

10 I've produced that show an accurate -- that depict

11 an accurate representation of what an observer at

12 the scene could see.

13   Q.   Let me see those.

14   A.   Do you want to mark --

15   MR. GARMER:   Yes, mark those as the next

16 numbered exhibit.

17              (WHEREUPON, Cades Deposition

18               Exhibit No. 18 was marked for

19               identification.)

20 BY MR. GARMER:

21   Q.   Now, it looks like starting with

22 Photographs D16970-025 through 058 are photographs

23 which you say the -- an accurate observer at the

24 scene could see.   Is that a fair statement?

25   A.   No, sir.

1    Q.    Tell me what these show.

2    A.    So those are the raw photographs that I

3 used to create the calibrated images.  The

4 calibrated images are the representation, an

5 accurate depiction of what an observer at the scene

6 could see.

7    Q.    At what point in time?

8    A.    At the distances that we took -- that I

9 took the pictures from.

10    Q.    And where was the lighting for all of

11 these photographs coming from?

12    A.    Similar to this area -- similar to the

13 incident area of the interstate, there were

14 areas -- there were overhead lights present on this

15 road.  And in those areas you could see where there

16 were some areas where the light was brighter, and

17 there were other areas between where it was darker.

18         And so I positioned the trailer in the

19 areas of darkness to most accurately replicate the

20 situation and the scene at the time of the incident

21 where the area of the incident was described to be

22 between some of the overhead luminaires.

23    Q.    These photographs in -- on November 17th

24 of 2017 were not taken at Morton's Gap, were they?

25    A.    No, sir, they were not.

Page 100

1    Q.    They were not taken in Kentucky, were

2 they?

3    A.    No, sir, they were not.

4    Q.    They were taken in Nashville, Tennessee;

5 is that correct?

6    A.    That is correct.

7    Q.    And they were taken on a highway which was

8 not an interstate highway; is that correct?

9    A.    That is correct.

10    Q.    It was a usual roadway that was a

11 non-interstate roadway; is that correct?

12    A.    I would agree that it was a non-interstate

13 roadway.

14    Q.    How would you describe it?

15    A.    It was in an industrial park.  It was a

16 lightly traveled, relatively low-illuminated

17 roadway, not an interstate.

18    Q.    Do you agree that many of these

19 photographs do not replicate the lighting

20 conditions that were present at and around the exit

21 ramp at Morton's Point Gap on July 6, 2016?

22    MR. JONES:  Objection, form.

23        You can answer.

24    THE WITNESS:  None of those photographs

25 represent the lighting -- first of all, none of

1 those photos are an accurate depiction.  The ones

2 that you're holding in your hand --

3     MR. GARMER:  Yes.

4     THE WITNESS:  -- are an accurate depiction of

5 lighting, period.

6           Second of all, as I've stated, this

7 location was chosen to attempt to closely resemble

8 the lighting and the topography in the area of the

9 incident, but it is not an accurate -- an exact

10 replication, no.

11 BY MR. GARMER:

12     Q.   And, to be fair, it's not an accurate

13 representation?

14     A.   It is not a -- it's not meant to be an

15 accurate or exact representation of the incident

16 area.  It's meant to be an exemplar site which for

17 the factors surrounding the conspicuity and

18 visibility of this trailer to an approaching driver

19 would be similar to allow for evaluation.

20     Q.   Okay.  We're going to have to go through

21 these one by one.  It looks like there's 58 of

22 them, 58.  Oh, I'm wrong about that.  It's 025 to

23 058.  Let's do it this way, see if we can speed it

24 up.

25           Can you show me which one of these

1 photographs are meant to accurately depict the

2 lighting condition as it was at Morton's Gap on

3 August the 6th of 2016?

4     A.    None of those.

5     Q.    If that's the case, how are they valuable

6 to you in your testimony?

7     A.    So again those are the raw images that

8 were used to create the calibrated images which are

9 in the next tab.  The calibrated images are a fair

10 and accurate representation of what I could see at

11 this exemplar location.  The exemplar location was

12 chosen because it is similar in both ambient

13 illumination and lighting conditions as well as

14 roadway topography and would present a similar view

15 that a driver approaching the trailer on the night

16 of the incident would have.

17     MR. GARMER:  And in this explanation that you

18 just made, you are now referring to a series of

19 photographs, four photographs, and we'll mark those

20 as the next numbered exhibit.

21                    (WHEREUPON, Cades Deposition

22                    Exhibit No. 19 was marked for

23                    identification.)

24 BY MR. GARMER:

25     Q.    So tell me what those represent.

1    A.    So these are the calibrated images that

2 were produced and printed on a calibrated printer

3 that are a fair and accurate depiction of what an

4 observer at this scene could see.

5    Q.    Okay.  And you have marked these as

6 365 feet, 600 feet, 450 feet, and 600 feet.  The

7 365 feet is not annotated at all.  The 600 feet is

8 not annotated at all.  The 450 feet is not

9 annotated at all.  And the 600 feet is annotated

10 with headlights off.

11        Now, explain to me the difference on all

12 those.

13    A.    So as Miss White was approaching, the

14 testimony is that her headlights were on and, you

15 know, so the three pictures that were taken at

16 they're -- that as you described are not annotated,

17 were taken with the headlights on the Sebring on.

18        The fourth picture that's described as

19 headlights off --

20    Q.    Were they on bright or were they on low?

21    A.    Low.  I've seen no evidence to suggest

22 that her lights were on high beams.  I know that

23 when they looked at the position of the light

24 switch after the accident, that they were just

25 noted as on, so --

1    Q.    You don't know whether they were on high

2 beam or low beam?

3    A.    The -- again I see no evidence to suggest

4 they were on high beam, and the -- you know, so the

5 testimony we have is that they were on, and I think

6 it's, you know, reasonable to surmise that they

7 were on low beam.

8    Q.    But these photographs don't show that the

9 lights were on high beam or low beam; is that

10 right?

11    MR. JONES:  Objection.

12        You may answer.

13    THE WITNESS:  The lights were on low beam.

14 BY MR. GARMER:

15    Q.    The lights were on low beam?

16    A.    Yes, sir.

17    Q.    Now tell me what they depict.

18    A.    Again, these images, you know -- so again

19 the three that you described as not annotated all

20 have the lights -- the low beam headlights on the

21 Sebring on.  And the last one that I've annotated

22 as 600 feet, headlights off, that is a picture with

23 the headlights off.

24        The reason that I took this last picture

25 with the headlights off was to show that, all else

1 being equal, no other lights in the environment

2 were changed.  And you can see the difference.  You

3 know, I can show a jury other than just describing

4 the difference that headlights at even 600 feet

5 make in terms of the visibility and conspicuity of

6 the conspicuity tape.

7    Q.   Was the truck in these photographs, was it

8 moving or stopped?

9    A.   It was stopped.

10    Q.   And at 600 feet, do you believe that is

11 the distance that Krystal White would have been

12 able to visualize the truck?

13    A.   You know, again, as I think I've stated

14 multiple times now, the -- a driver in her

15 position -- an alert and attentive driver in her

16 position would have the truck available to be seen

17 at distances of a thousand feet or more.

18    Q.   Why did you pick 600 feet?

19    A.   600 feet is a -- was a longer distance, a

20 distance that was sufficient for an alert and

21 attentive driver to avoid striking the vehicle, and

22 was a good representation of what that truck looked

23 like, what that trailer looked like when I was at

24 that scene at a longer distance than the other two.

25 So 600 was just meant to be a longer distance.

1    Q.    There are ambient lights in each of these

2  four photographs.   Do these -- are these ambient

3  lights, do they depict the ambient lights that were

4  at Morton's Gap on the night of August the 6th?

5    A.    The type and relative positioning of the

6  ambient lights were, you know, were similar in the

7  sense that they both had ambient light.   The

8  lighting levels, again based on -- based on when I

9  was at Morton's Gap and when I was at this incident

10  scene, the lighting was similar, certainly not the

11  same.

12          And, more specifically, the trailer was

13  positioned in a darker area of the road in between

14  where a lot of the overhead lights that you see in

15  those pictures were to most accurately represent

16  that the description of the incident area where the

17  trailer was between overhead lights.

18    Q.    Did you measure the foot power or the

19  candlelights of the lights at the Morton's Gap exit

20  and what it was on the night of August the 6th?

21    A.    The night of the incident, no, I did not.

22    Q.    Did you measure it when you were first at

23  the incident scene in August of 2016 -- '17?

24    A.    Yes, I did.

25    Q.    And where are those measurements?

1    A.    They are on the handwritten drawings

2 that -- the handwritten notes the accident -- or

3 the diagram of the exit we discussed earlier.

4    Q.    And what did you write on those

5 handwritten diagrams?  What -- did you write the

6 type of light, the size of the light, how many

7 lights were there?  Did you write all of that?

8    A.    So again between the photographs and this

9 document, I have the location of the lights, and

10 then they were multiple fixtures within each one,

11 so I --

12    Q.    How many?  How many?

13    A.    It looked like each one had like, I think,

14 six.

15    Q.    Does that -- do your notes indicate that?

16    A.    My notes indicate how many were on or off

17 on the two that were right in the ramp area where I

18 was.

19    Q.    And how many were on or off?

20    A.    I've got one light that states three on,

21 three off.  And I've got another light that states

22 five on.

23    Q.    And do you know how high in the air those

24 lights were?

25    A.    No, sir, I do not.

1    Q.    Do you know what the candle power of each

2 one of those lights was?

3    A.    Not specifically each light, no.

4    Q.    You didn't write that down?

5    A.    No, sir.

6    Q.    And your photographs that you took in

7 Nashville, Tennessee, on November the 17th of 2017,

8 did you write down how many lights were in that

9 area?

10    A.    I did not write down the number of lights,

11 no.

12    Q.    So we don't know how many lights were in

13 the area of your photographs?

14    A.    I think you can tell by looking at the

15 photographs.

16    Q.    Well, can you tell me by looking at these

17 photographs?

18    A.    Possibly, if I could see them.

19    Q.    You can see them.

20    A.    So again similar to the incident area,

21 there's some lights on businesses off to the side,

22 off the side of the road that would not provide

23 ambient illumination onto the roadway?

24    Q.    How many lights, and where were they

25 located?

1    A.    In the pictures I see, this one business

2 here looks like it has -- looks like it has about

3 seven -- seven or eight lights there.

4    Q.    Do you know what the candle power of those

5 lights are?

6    A.    No, sir, I do not.

7    Q.    Do you know how high off the ground those

8 lights are?

9    A.    I could certainly estimate, but not

10 specifically.

11    Q.    Did you measure how high off the ground

12 they are?

13    A.    I did not take measurements on things that

14 were not relevant to my analysis.

15    Q.    Did -- how can you compare those lights to

16 the lights that were available to Krystal at

17 Morton's Gap on the night of August the 6th?

18    A.    What I was interested in is, were the

19 lights that would affect the illumination of the

20 trailer similar to what was available at Morton's

21 Gap, and was the general topography of the roadway;

22 i.e., the sight lines, similar to what was

23 available at Morton's Gap, and were they similar

24 such that a calibrated photograph taken at that

25 location would accurately show what a trailer with

1 similar markings, similar lighting under similar

2 conditions would look like.

3    Q.   Do -- did you try to in your photographs

4 that you took in Nashville, Tennessee, on

5 November the 17th of 2017, do those photographs try

6 to depict a rising roadway such as you have

7 testified to that you know existed at Morton's Gap?

8    A.   Again as I've testified to, while I am

9 familiar there was a rise in the roadway, within

10 the distance and the area that these photographs

11 are concerned with, they accurately depict and are

12 similar to the topography of that same distance at

13 the Morton's Gap area.

14    Q.   But it's clear that you can't tell the

15 court as we sit here today what the rise is on the

16 roadway at Morton's Gap where the collision

17 occurred?

18    MR. JONES:  Objection, asked and answered.

19 BY MR. GARMER:

20    Q.   Does that -- is that correct?

21    A.   As I sit here today, I cannot give you a

22 number in degrees or feet.  That would answer your

23 question.

24    Q.   And you can't tell us that the photographs

25 taken in Nashville Tennessee, on November the 17th

1 of 2017 have any similar rise in the roadway?

2    MR. JONES:  Objection, asked and answered.

3        You can answer again.

4    THE WITNESS:  I certainly can say that.

5 BY MR. GARMER:

6    Q.   Tell me how you can say that, that if

7 those photographs that you put before us here today

8 appear to be photographs that show a totally flat

9 roadway, no rise to it at all.

10    A.   And based on my inspection of both the

11 incident scene and this exemplar scene, in the

12 distances that I took these photographs at, those

13 similar distances at the Morton's Gap section of

14 the interstate was similarly flat, flat to the

15 extent that there was nothing about the roadway in

16 those distances that would affect any person, a

17 reasonably alert and attentive person, in that

18 area, would not affect their perception or ability

19 to perceive and react to the presence of a hazard

20 such as this truck.

21 BY MR. GARMER:

22    Q.   You would agree with me that you would

23 tell the court that the photographs taken in

24 Nashville, Tennessee, on November 17 of 2017, you

25 have made no attempt to replicate the exact

1 lighting conditions that would have been available

2 at Morton's Gap on August the 6th of 2016, you

3 would agree with that, wouldn't you?

4     MR. JONES:  Objection, form, asked and

5 answered.

6          You can answer again.

7     THE WITNESS:  What I would say is I attempted

8 to closely, as closely as I could, match the

9 lighting conditions from the Morton's Gap area to

10 the scene in Nashville, Tennessee, such that the

11 ambient illumination shining on the trailer which

12 is our object that we're talking about trying to

13 see here, trying to perceive and react to, would be

14 similar.

15 BY MR. GARMER:

16     Q.   But it's fair to say that you took no

17 measurements to show the court how the lighting at

18 Morton's Gap on August 6 of 2016 was equivalent to

19 the lighting in Tennessee on November the 17th of

20 2017?

21     MR. JONES:  Objection.

22          You can answer.

23     THE WITNESS:  Given all of the construction at

24 Morton's Gap and all the changes in the lighting

25 that have occurred since the time of the accident

1 to the time of my inspection, I was unable to

2 measure or try and quantify the light, the specific

3 light in that area, the ambient illumination in the

4 area of impact on the night of the accident.  That

5 just did not exist anymore.  It was not available

6 to be measured.

7            So what I did is evaluated the description

8 of the area contained in the police report, also

9 contained in the analysis provided by Dr. Francis

10 of the position of the lights.  And having been

11 there, I know what, you know, roughly what kind of

12 lights they are.  And then I found a location that

13 would allow me to place the trailer under similar

14 ambient illumination conditions on a

15 topographically similar roadway.

16 BY MR. GARMER:

17     Q.    What is the address where you took those

18 photographs?

19     A.    I don't believe I have that in my file

20 here.

21     Q.    So we couldn't go find that area that you

22 took those photographs if we went down there right

23 now?

24     A.    I know at some point in time I had that

25 information because obviously I got there, and I'm

1 sure that I could go find it again.

2     Q.    But you can't tell the court what the

3 exact location is of those photographs that you

4 took?

5     A.    Not as I sit here right now, I can't.

6     Q.    And you can't tell the court the precise

7 specifics of the lighting at the location in

8 Tennessee?

9     MR. JONES:  Objection.

10     THE WITNESS:  I don't agree to that.

11 BY MR. GARMER:

12     Q.    Well, tell me what -- how you can do that.

13     A.    So what I have recorded -- so I have

14 recorded the ambient illumination of areas near the

15 streetlights as well as in the shadow where the

16 truck was.

17     Q.    You haven't made that same recording of

18 what existed at Morton's Gap on August 6 of 2016,

19 have you?

20     A.    Again, I think I've been pretty clear in

21 stating that is not possible.

22     Q.    So the answer would be that you have not?

23     A.    As I've stated, correct.

24          So just to help you out here, the next --

25 all the rest of the material is things, before you

1 close it, that were supplied to me by Mr. Jones'

2 office with the exception of in front of each

3 deposition, there is a deposition summary that's

4 been prepared at my direction.

5    Q.   I know you won't believe this statement,

6 but I figured it out, I'm not quite as done as I

7 look.

8    A.   Oh, I didn't know if you had turned the

9 pages and then figured we could skip -- turn it

10 through a couple thousand pages there.

11    Q.   I did.  I figured we'd reached the end of

12 the line which everybody is glad to hear.

13        Okay.  Thank you for that.  I didn't mean

14 to be a smart aleck.

15    A.   Oh, no, quite fine.

16    Q.   Now I'm looking at the conclusion of your

17 report.  It's on Page -- no, I'm not looking at

18 yours.

19    MR. JONES:  Bill, before you go on to the next,

20 if you truly want the address, we can -- I can tell

21 you the address, but that's up to you.

22                        (WHEREUPON, Cades Deposition

23                         Exhibit No. 20 was marked for

24                         identification.)

25

1 BY MR. GARMER:

2     Q.    I want to turn to the page of your

3 report --

4     A.    Top left.

5     Q.    -- Page 11, that depicts the schematic

6 illustration of what you call the concept of the

7 critical window, looming threshold, and critical

8 distance.  Is that something that you did yourself?

9     A.    That is a diagram that is cited out of --

10 if you look at Footnote 56, it's a paper --

11    Q.    Yes.

12    A.    -- by Krauss, et al.

13    Q.    Yeah.

14    A.    And that is a diagram from that paper.

15    Q.    And are you using that as a -- something

16 that you're going to use as a descriptive diagram

17 in your testimony?

18    A.    It is a demonstrative that I use to show

19 visually what -- how someone would go about

20 perceiving and reacting to a specific type of

21 stimulus.

22    Q.    Do you have -- do you have actual

23 measurements on this diagram?

24    A.    So the measurements -- so this is a

25 general diagram that just shows the kind of order

1 and depiction as, you know, we proceed over a

2 distance of each of these.  For any individual

3 case, we can assign or calculate either ranges or

4 specific numbers for these different segments.

5     Q.    Okay.  You say there on that page that

6 based on deposition testimony from witnesses,

7 Mr. Sanchez's vehicle was either stationary or had

8 just begun moving toward the exit ramp prior to the

9 collision.  Is that your opinion?

10    MR. JONES:  Objection.

11 BY MR. GARMER:

12    Q.    That the vehicle was either stationary or

13 had just begun to move forward?

14    A.    So again that's based on the deposition

15 testimony cited below that that's how the

16 incident's been described.

17                    (WHEREUPON, Cades Deposition

18                    Exhibit No. 21 was marked for

19                    identification.)

20 BY MR. GARMER:

21    Q.    Okay.  Now, on Page 12, there is a

22 photograph.  What is that supposed to show?

23    A.    So just to clarify, that's not a

24 photograph.  That is a -- it's a figure or an image

25 or however a computer -- it's a computer-made

1 image.  It's not a photograph.

2    Q.   Where is that?  You have that -- is that

3 the original that you just showed me?

4    A.   It is just a color copy of the black and

5 white copy that you're looking at.

6    Q.   And what does it show?

7    A.   So that in explaining this concept of

8 looming and the looming threshold and the cue of

9 looming, what that is based on and what the

10 calculations that allow us to come up with this

11 number are based on is this idea that the stimulus

12 that you're approaching is nothing but two points

13 in space, and that as you approach what you're

14 perceiving is the relative distance between those

15 points and more specifically the rate of change of

16 how those points become further apart as you get

17 closer, and that using that information, you can

18 appreciate the speed of the object that those

19 points are attached to.

20    Q.   How far away is the observer in this

21 photograph from those two points?

22    A.   That is not at all a characterization of

23 that figure.  So there's no set distance that that

24 is apart because it would depend on how far apart

25 those two points are.

1    Q.    Well, when you show this to the jury, what

2 are you going to say?

3    A.    That this is the stimulus that as you

4 approach that, so if you -- just right now as

5 you're holding that paper, if you move that paper

6 in front of you further away, then those two points

7 are going to get slightly closer together.  As you

8 bring that piece of paper closer to your face,

9 those two points will get further apart.  And it is

10 the looming threshold and the cue of looming is all

11 about how we perceive the rate of change of that

12 distance.

13    Q.    Then if I ask you the question, how does

14 this show what Krystal White was seeing on the

15 night of August 6, 2016, what would you say?

16    A.    A couple things.  First of all, as far as

17 what was available to be seen, you know, those two

18 points are thought to -- you know, we're simulating

19 taillights, but we're simulating taillights in a

20 pitch black environment with no other lights and no

21 other visual cues.  So to the extent that those are

22 similar to taillights on the trailer, that would be

23 one of many cues available to a driver approaching

24 in her position.

25    Q.    From what distance?

1    A.   They would first become available to be

2 seen at whatever that clear sight distance, sight

3 line distance that again as, you know, I've said

4 many times now is well over a thousand feet.

5    Q.   But what does this photograph show in

6 terms of distance?

7    A.   I --

8    Q.   How close or how far away was Krystal

9 White from this photograph?

10    A.   That's completely misrepresenting the

11 purpose of that demonstrative figure in my report.

12    Q.   I don't mean to be misrepresenting

13 anything.  I mean to ask that as a question.  If I

14 ask you that question, how does that show us where

15 Krystal was at some specific point in time just

16 before the collision?

17    A.   And my answer would be, the purpose of

18 that demonstrative figure is not at all to show

19 what a specific driver would be seeing.  It is

20 to -- the purpose of that figure is to explain to a

21 jury and to the court how looming works, what

22 looming is, and then as far as applying it to this

23 incident that we're talking about the maximum width

24 of an object.  In this case it would be the outside

25 edges or outside taillights on the back of the

1 trailer.

2     Q.    Would it have been possible for you to set

3 up an exhibit for looming that would have attempted

4 to parlay a specific point in time where Krystal

5 was just prior to the collision?

6     A.    So it is certainly possible to pick a

7 distance, pick an object, in this case a trailer,

8 and with a known distance and a known size of the

9 trailer, that image could be created such that I

10 could say that this is the width of the taillights

11 on that trailer from 300 feet away.  That's

12 certainly possible.  However, it has absolutely

13 nothing to do with the purpose of that figure in my

14 report, nor does it have anything to do with how we

15 apply or how I apply the motion cue, the visual

16 motion cue of looming to trying to understand how a

17 reasonably alert and attentive driver could attempt

18 to avoid a hazard.

19     Q.    Let me see if I get this right.  What

20 you're saying is you could buy a photograph such as

21 the one that's in Exhibit -- or on Page 12.  You

22 could depict what a driver like Krystal could see

23 from a specific distance of a truck the size of

24 Ramirez's truck, but that this photograph on

25 Page 12 does not attempt to do that?  That's a

1 question.

2     A.    I'm sorry.  So that is not -- that's not

3 an accurate description of what I've testified to

4 or what that page represents.

5     Q.    Does this page represent a specific point

6 in time as to what Krystal White could see on the

7 night of August the 6th if she looked?

8     A.    No.

9     Q.    We need to make a copy of this because

10 it's got color in it.

11     A.    Okay.

12     Q.    Can we do that?

13     A.    Sure.

14     THE WITNESS:  Would it be okay to take a quick

15 break then?

16     MR. GARMER:  Oh, sure.

17     VIDEOGRAPHER:  We're off the record at

18 12:28 p.m.

19                    (WHEREUPON, a short recess was

20                     taken.)

21     VIDEOGRAPHER:  We are back on the record at

22 12:37 p.m.

23 BY MR. GARMER:

24     Q.    I'm not sure that we talked about or used

25 this exhibit.  If we did, please remind me.

1    A.    I don't believe we've discussed this yet.

2    Q.    Okay.  Let's do.

3    A.    So this is a set of calculations to

4  calculate this looming threshold number.  So this

5  allows us to -- allows me to calculate the point in

6  time or the distance given the relative speed of

7  two objects and the size of the object that is

8  being approached to determine just given that

9  distance cue at what point would we expect -- would

10 I expect a reasonably alert and attentive driver to

11 be able to determine that that object is stopped or

12 slow moving utilizing only that information.

13   Q.    One time I was on I-24 down in west

14 Kentucky on the interstate highway, and it was just

15 before sunset.  And I suddenly realized that in the

16 left hand, I was in the right-hand lane, that a

17 vehicle was coming at me from the opposite

18 direction in my same lane of traffic.  Fortunately,

19 he was in the left-hand lane and went past me

20 without impacting me.  Why was I not able to

21 perceive that until he was -- with taking no

22 evasive action from a human factor standpoint?

23   A.    With respect to, you know, any individual

24 specifically, you know, there are certainly

25 individual differences with respect to how quickly

1 people respond, what people are doing.  And so when

2 we talk -- when I talk about this reasonably alert

3 and attentive, we're trying to capture a larger

4 population of the driving community.  That being

5 said, if I were analyzing this --

6     Q.    Hypothetical.

7     A.    -- this hypothetical scenario that

8 actually hypothetically happened to you --

9     Q.    Yes.

10    A.    -- what I would look at is, you know, what

11 were the different cues available.  So, you know,

12 we look at the lighting conditions, you know, as

13 you've described them.  We look at the relative

14 positions of the two vehicles.  We would factor in

15 what you were doing at the time.  So you look at

16 the environment, and then we look at the driver.

17 Were you, you know, adjusting your radio or, you

18 know, talking to a passenger or on your cell phone

19 or looking in your backseat, scanning your mirror,

20 any number of things.

21          So we try to gain information as to, you

22 know, what the driver is doing.  Was there anything

23 in particular about you as an individual that would

24 affect your ability to perceive and react to

25 something, you know, visual acuity, you know, their

1 age, you know, any of these individual factors.  We

2 look at all this stuff.  And then based on that we

3 can determine reasonable estimates of how quickly

4 we would expect someone to react.

5          Now, we add that to the relative speeds of

6 the two vehicles described in this hypothetical.

7 So again I'm going to make just some assumptions

8 that both vehicles traveling at highway speeds, you

9 have a very high closing speed.  And so that

10 distance that's covered as the two vehicles move

11 towards each other, it could be such that and, you

12 know, without crunching the numbers, that you were,

13 in this hypothetical, that you were in the process

14 of your perception response time process.  And the

15 impact or the point that which you and this other

16 vehicle passed occurred while you were still in the

17 midst of that process.

18          So that is a potential explanation given a

19 lot of other, you know, assumptions which we're not

20 discussing as to why you, as you've described, felt

21 like the other vehicle's already past you by the

22 time you would have been able to do anything.

23    Q.   Were you able to calculate whether

24 Ramirez's truck was moving at the time of collision

25 or was stopped?

1    A.    So, you know, again as we talked about

2 earlier, I did not calculate that independently.

3 I'm relying on the analysis and -- the analysis of

4 both Dr. Noll and Mr. Miller as well as the

5 testimony of the witnesses.  So the witnesses state

6 that again as Miss Oelschlager was passing the

7 vehicle, Mr. Ramirez's vehicle began moving

8 forward.

9         And then both Mr. Miller and Dr. Noll in

10 their, you know, the Delta V calculations or the

11 speed change calculations, showed that the Delta V

12 experienced by Miss White's vehicle was less than

13 the speed it was going which they interpret to mean

14 that the Ramirez vehicle was moving at the time of

15 impact.

16    Q.    But at trial you don't intend to give us

17 an opinion about whether the Ramirez vehicle was

18 stopped or moving forward?

19    A.    Other than to cite to and agree with both

20 accident reconstructionists who have been hired as

21 experts in this case, no.

22    Q.    And, to be fair, that -- it's outside your

23 field of expertise?

24    A.    Yes, sir, that's true.

25    Q.    Now, you mentioned when I talked about my

1 situation, you mentioned that there were various

2 factors that needed to be taken into account as to

3 what the reaction time is of a given individual;

4 that is, their age, their visual acuity, those

5 kinds of things.  Did you take into account any

6 physical characteristics that Krystal had on

7 August 6 of 2016 in trying to calculate how she

8 reacted and why she reacted the way she did?  Did

9 you have any of her physical characteristics

10 available to you?

11      A.   So in assessing a -- what I'm, you know,

12 trying to do in that type of analysis is assess

13 what would be a reasonable range of perception

14 response times for an alert and attentive driver in

15 that situation.  Given that range and the other,

16 you know, vehicle handling and then available

17 environmental information, would that lead to a

18 situation such as this one that would be what I

19 described as an avoidable hazard.

20           And then looking at the individual driver,

21 so obviously we're sitting here because this was a

22 hazard that was not avoided.  And so what are

23 potential reasons that could contribute to a driver

24 in her position not being able to avoid the

25 incident.  And so absolutely we start looking or I

1 would start looking at, you know, any individual

2 factors.  And with respect to, you know,

3 Miss White, there was nothing that I've seen either

4 age related or medically related or vision related

5 as far as acuity and things that would have led me

6 to expect her to have any deficiencies with respect

7 to perception response time.

8     Q.   What are your -- what is the perception

9 response time you use generally for people --

10    MR. JONES:  Objection.

11 BY MR. GARMER:

12    Q.   -- in a situation like this?

13    A.   So as I state in my report, a reasonable

14 range of perception response time for a highly

15 conspicuous hazard such as this was -- would be

16 1.5 to 2 seconds.

17    Q.   And that's a reaction response time taken

18 together?

19    A.   Perception reaction time, so --

20    Q.   Yes.

21    A.   -- that is the time from -- and again I

22 think Dr. Francis also went through this.

23         It's a process by which we perceive

24 something in the environment through the time to

25 which we take an action.  So that action is by the

1 time your foot hits the brake or turns the steering

2 wheel in this case.

3     Q.    And then not just hits the brake, but

4 brings her vehicle to a stop?

5     A.    So that's a separate component.

6     Q.    Okay.  How much is that?

7     A.    So that I would rely on Dr. Noll for.  And

8 based on the information that he's provided,

9 depending on the amount of braking or how hard or

10 heavy or however he would describe the braking, you

11 know, that could be anywhere from -- once the

12 brakes are applied, that could be anywhere from

13 220-or-so feet all the way up to 670-or-so feet.

14     Q.    And that distance increases with the speed

15 of the vehicle?

16     A.    The distance -- well, this is all assuming

17 a constant speed of the vehicle.  This -- yeah, so

18 this assumes a constant speed of the vehicle at

19 71 miles an hour.

20     Q.    So you assume the constant speed of the

21 vehicle is 71 miles an hour, and you assume a

22 perception reaction time of 1.5 to 2 seconds.  And

23 you then assume how much time it takes to bring the

24 vehicle to a full stop.  How much is that?

25     A.    So the distance -- so again so those are

1 the distances based on those different braking

2 coefficients that Dr. Noll provided.  And if you

3 put all that together, it would take anywhere from

4 4.4 to 10.8 seconds to perceive the trailer, decide

5 on a course of action, initiate a braking response,

6 and bring the vehicle to a stop.

7     Q.   And would those calculations show that

8 that would have made Krystal collide with the

9 truck?

10     A.   Certainly the longer distances would have

11 reduced the likelihood of avoidance.  The longer

12 distances specifically are a braking coefficient

13 that is -- let's see exactly how Dr. Noll describes

14 it.

15          So he states at Miss White's traveling

16 speed, the vehicle could be slowed to a stop under

17 normal braking levels which is the

18 0.25 deceleration, heavy braking which is 0.5 or

19 what he characterizes emergency braking which is

20 0.75.

21          I would expect in a situation like this

22 that we would see a driver do more than normal

23 braking.  So while some of those higher numbers

24 would, you know, would be just a normal stop, I

25 would expect that the more reasonable would be some

1 of the closer numbers.

2     Q.   But you agree that under your analysis, if

3 Krystal had normal reaction time of 1.5 to

4 2 seconds and then had braking distance of up to

5 10.8, she would have been involved in a

6 collision --

7     MR. JONES:  Objection.

8 BY MR. GARMER:

9     Q.   -- even under normal circumstances?

10    MR. JONES:  Objection.

11         You may answer.

12    THE WITNESS:  The component that that analysis

13 does not take into account is at what point a

14 driver in that position would perceive that they

15 needed to react.  So, again, based on this cue of

16 looming alone, and the situation we have is more

17 than looming, so looming is just these two points

18 in pitch-black environment.

19         We add to that in this case the additional

20 lights on the rear of the trailer, the presence of

21 the conspicuity tape, any minimal ambient

22 illumination shining on the trailer from the lights

23 on the highway, we add to that that if the trailer

24 was as described by the accident reconstructionist

25 not perfectly parallel with the roadway and

1 slightly angled, you then have the appearance of

2 additional marker lights, potentially additional

3 conspicuity tape.

4          You also then have the actions of at least

5 one driver in front of Miss White who maneuvered

6 around the vehicle, and at some point the

7 headlights from that vehicle shined on the trailer.

8 So all of those cues would be on top of the

9 looming.  Given looming alone we would -- I would

10 expect that to be perceived at no closer than

11 365 feet.  And so we add on all those other cues,

12 that distance gets much longer.

13          So going back to the analysis, if

14 Miss White had or a driver -- a reasonably alert

15 and attentive driver in her position had perceived

16 the tractor-trailer at any distance longer than it

17 would take to perform an avoidance maneuver -- and

18 again that's the braking.  There's also lateral

19 movement.  There's also the combination of the two.

20 Then that is what all leads me to the conclusion

21 this was likely an avoidable accident.

22 BY MR. GARMER:

23     Q.   But you agree that under your statistics

24 and your evaluation, if her perception reaction

25 time was up to 2 seconds and then her optimal or

1 her maximum stopping time was 10.8 seconds, you

2 take all that into effect, she'd have crashed into

3 that truck?

4     MR. JONES:  Objection, asked and answered.

5         You can answer again.

6     THE WITNESS:  Depending on when she

7 specifically or a driver in that specific situation

8 perceived that they needed to do something.

9 BY MR. GARMER:

10    Q.   But you agree that even under your

11 calculation, she would have crashed into the truck

12 even if everything had gone perfect?

13    MR. JONES:  Objection, asked and answered.

14        You can answer again.

15    THE WITNESS:  No, sir.

16 BY MR. GARMER:

17    Q.   Well, the likelihood of her crashing into

18 the truck would have happened?

19    MR. JONES:  Objection, asked and answered.

20        You can answer again.

21    THE WITNESS:  I'm sorry.  Can you repeat that

22 question?

23 BY MR. GARMER:

24    Q.   Well, if she had a 2-second reaction

25 time --

1    A.   Okay.

2    Q.   -- perception reaction time, and then it

3 took her 10.8 seconds to bring the vehicle to a

4 stop after that, would that have caused a

5 collision?

6    MR. JONES:  Objection, asked and answered.

7         You can answer.

8    THE WITNESS:  So, first of all, the 2 seconds

9 is included in that 10.8.

10 BY MR. GARMER:

11    Q.   Okay.

12    A.   So make sure we're not double-dipping

13 here.

14    Q.   All right.

15    A.   The 10.8 is the, you know, longest of the

16 estimates provided by Dr. Noll for braking.  Again

17 I've already stated I would expect it to be shorter

18 than that, but if we just want to give normal

19 braking, so had a driver utilizing that, as he

20 characterized, Dr. Noll, normal braking, had the

21 driver perceived that they needed, he or she needed

22 to do something prior to this 10.8 seconds,

23 880 feet, then the accident wouldn't have happened.

24    Q.   But if she didn't, the accident would have

25 happened?

1    A.    Certainly if we have a driver who is not

2 acting reasonably alert and attentive or is

3 otherwise inattentive, then regardless of the cues

4 available and things, it's certainly possible that

5 an accident happens.

6    Q.    Because there was really the outside limit

7 of reaction was 10.8 seconds?

8    MR. JONES:  Objection.

9         You can go ahead and state your testimony

10 again.

11    THE WITNESS:  The answer to your question is,

12 no, sir.

13 BY MR. GARMER:

14    Q.    Well, those are the calculations you gave

15 us.  I mean, I'm not making those calculations up.

16 I'm just repeated the ones you just went through.

17    MR. JONES:  Objection.

18 BY MR. GARMER:

19    Q.    So I guess I'm not following you.

20         As I understand what you said, it is a

21 normal calculation that under these circumstances

22 it would take a driver -- could take a driver like

23 Krystal up to 10.8 seconds to bring her vehicle to

24 a stop?

25    A.    That is a possible calculation for a

1 driver who utilizes what Dr. Noll characterizes as

2 normal braking.  It would take -- if we add in the

3 2.0 second perception response time which is on the

4 longer end of my estimate and we take the most

5 light braking that Dr. Noll provides, then the

6 10.8 seconds is a correct number.

7    Q.   Okay.  And at 10.8 seconds, you agree that

8 Krystal would have crashed into Ramirez's vehicle?

9    MR. JONES:  Objection.

10         You can answer.

11    THE WITNESS:  For a reasonably alert and

12 attentive driver approaching the Ramirez vehicle --

13 first of all, again, I would not expect such light

14 braking, but let's just assume that this was the

15 braking.  This was normal braking.  Depending on

16 the point at which that driver was able to perceive

17 that there was something to react to, it is

18 certainly possible that they could have avoided the

19 accident.

20 BY MR. GARMER:

21    Q.   And, likewise, it is certainly possible

22 that the accident would have occurred?

23    MR. JONES:  Objection.

24         You may answer.

25

1 BY MR. GARMER:

2    Q.   Under those calculations.

3    A.   Under those calculations, like I said,

4 it's possible that a driver would avoid the

5 accident.  It's possible that -- it is certainly

6 possible that a driver would get into an accident.

7 However, in the totality of the evidence, that

8 driver in this situation who would get into the

9 accident would not be one that I would characterize

10 as a reasonably alert and attentive driver.

11 BY MR. GARMER:

12    Q.   And you say that not knowing any of

13 Krystal White's physical characteristics, correct?

14 You don't know any of them?

15    MR. JONES:  Objection.

16        You can answer.

17    THE WITNESS:  That is not correct.

18 BY MR. GARMER:

19    Q.   What do you know?

20    A.   So I know her age.  I've seen no reference

21 to any specific medical condition or, you know,

22 vision condition or other individual type of

23 condition that I would normally look for when

24 determining if there were any individual factors

25 that I would think would lead to a longer

1 perception response time.

2          What I am aware of is the report of

3 Dr. Turek who suggests that it is possible that

4 fatigue played a role, and fatigue is certainly

5 something to elongate perception response time and

6 make someone a not reasonably alert and attentive

7 driver.

8          There's also been evidence that as she was

9 driving, she was using her cell phone.  If my

10 recollection is correct for both calls as well as I

11 think there were some text messages and Snapchat as

12 well, and again we know that cell phone use is

13 another thing that is associated with someone not

14 being a reasonably alert and attentive driver.

15          Now, I don't know specifically whether

16 those definitely happened in this case.  What I do

17 know is that she was not acting as a reasonably

18 alert and attentive driver, and those could be

19 possible reasons along with a number other things.

20    Q.    But that's all outside your expertise.  I

21 mean, you're not going to talk about fatigue

22 because that's outside your expertise?

23    A.    To the extent that testimony and evidence

24 is offered to suggest that Miss White at the time

25 was fatigued, I can certainly assess and use that

1 in my analysis to suggest why -- as a reason why

2 she might not have been alert and attentive.

3     Q.    But you can't testify that she was

4 fatigued, and you don't have the expertise to

5 testify as to whether or not she was fatigued?

6     A.    So I have in the past analyzed and looked

7 at sleep/wake cycles, work schedules and things of

8 that to look for fatigue.  I did not do that in

9 this case.  And again as I've stated, I am relying

10 on the conclusions and the analysis performed by

11 Dr. Turek specifically with respect to fatigue.

12     Q.    And you know for a fact that the evidence

13 states that Krystal was not on the phone for the

14 five minutes -- at least five minutes before the

15 collision?

16     MR. JONES:  Objection.

17         You may answer.

18     THE WITNESS:  My understanding, again I haven't

19 reviewed Mr. Bohn's deposition, that based on his

20 analysis and reports that she was using her phone

21 at a point in time while she was in the car, and

22 that at the moment of impact she was likely not

23 doing anything that would leave a recordable piece

24 of data on the phone that Mr. Bohn was able to

25 find.  I don't think anyone can say for sure one

1 way or the other that she didn't have her phone in

2 her hand, that she wasn't looking at it or

3 otherwise interacting with it.

4 BY MR. GARMER:

5     Q.   Why are you so emphatic about Miss White's

6 being on -- whether or not she was on the phone,

7 and you won't give us any opinion about what you

8 think about Mr. Ramirez who was by all the evidence

9 unequivocally on the telephone at the time of the

10 crash?

11    A.   I don't think that's consistent with my

12 representation of either driver in this case.

13    Q.   Well, was Mr. Ramirez on a phone at the

14 time of the crash in your opinion?

15    MR. JONES:  Objection, asked and answer --

16        You may answer.

17    THE WITNESS:  Again I don't have a specific

18 opinion as to whether or not he was on -- either of

19 them were on the phone at the moment of impact.

20 The evidence suggests that it is certainly possible

21 that Mr. Ramirez was on a phone call, you know,

22 right around the time of impact.  And the evidence

23 suggests that Miss White was likely not on the

24 phone at the moment of impact, not on a voice call

25 on the phone at the moment of impact.

Page 141

1     MR. GARMER:   Thank you, sir.   That's all the

2 questions I have.

3     MR. JONES:   Thanks.   Nothing further.

4     VIDEOGRAPHER:   We are off the record at

5 1:03 p.m.

6          FURTHER DEPONENT SAITH NAUGHT.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 STATE OF ILLINOIS  )

2                    )  SS:

3 COUNTY OF C O O K  )

4          I, RAELENE STAMM, Certified Shorthand

5 Reporter, licensed by the State of Illinois, do

6 hereby certify that heretofore, to-wit, on the

7 18th day of December 2017, personally appeared

8 before me DAVID M. CADES, PH.D., a witness in a

9 certain cause now pending and undetermined in the

10 United States District Court, Western District of

11 Kentucky, wherein WILLIAM STEFAN WHITE, et al., are

12 the Plaintiffs and TRANSPORTATION SERVICES, INC.,

13 et al., are the Defendants.

14          I further certify that the said DAVID M.

15 CADES, PH.D., was by me first duly sworn to testify

16 the truth, the whole truth, and nothing but the

17 truth in the cause aforesaid; that the testimony

18 then given by said witness was reported

19 stenographically by me in the presence of said

20 witness and afterwards reduced to typewriting by

21 Computer-Aided Transcription, and the foregoing is

22 a true and correct transcript of the testimony so

23 given by said witness as aforesaid.

24          I further certify that the signature to

25 the foregoing deposition was waived by counsel for

Page 143

1 the respective parties.

2          I further certify that the taking of this

3 deposition was pursuant to Notice and that there

4 were present at the deposition the attorneys

5 hereinbefore mentioned.

6          I further certify that I am not counsel

7 for nor in any way related to the parties to this

8 suit, nor am I in any way interested in the outcome

9 thereof.

10          IN TESTIMONY WHEREOF:  I have hereunto set

11 my hand this 29th day of December, 2017.

12

13

14

15                    <%Signature%>

16          CERTIFIED SHORTHAND REPORTER

17

18

19

20

21

22

23

24

25